In re SUNPOINT SECURITIES,
INC., Debtor.

Securities Investor Protection Corporation and Robert G. Richardson, Trustee of the Estate of Sunpoint Securities, Inc., Plaintiffs,

v.

Cheshier & Fuller, L.L.P., King Bourland, Jeff Cheshier, Jack Sprawls, James Conner, Jack Savage and Bret Robertson, Defendants.

Cheshier & Fuller, L.L.P.,
Third–Party Plaintiff,

v.

Van R. Lewis, III, Mary Ellen Wilder, and Doug Dieter, Third–Party Defendants.

Bankruptcy No. 99–6073.
Adversary No. 00–6068.

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

April 23, 2007.

520

<br>

Michael L. Knapek, Emily S. Donahue, and Jeffrey G. Hamilton, Jackson Walker, LLP, Dallas, TX, for Plaintiff, Robert G. Richardson, Trustee.

Deron Dacus, Ramey & Flock, P.C., Tyler, TX, for Plaintiff, Securities Investor Protection Corporation.

Eric W. Pinker, Cody L. Towns, Lynn, Tillotson & Pinker, L.L.P. Dallas, TX, for Defendants, Cheshier & Fuller, L.L.P., King Bourland, Jeff Cheshier, Jack Sprawls, James Connor, Jack Savage, and Bret Robertson.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

BILL PARKER, Chief Judge.

### Findings of Fact

*Introduction*

1. At all times relevant to the above captioned Adversary Proceeding No. 00–6068, Sunpoint Securities, Inc. ("Sunpoint") was a member of the Securities Investor Protection Corporation ("SIPC").[1]

2. On November 19, 1999 ("Decree Date"), the Honorable John Hannah, Judge of the United States District Court for the Eastern District of Texas, signed an Order granting the relief requested in an application for protective decree filed by SIPC in the case styled Securities and Exchange Comm'n v. Sunpoint Securities, Inc., et al., Civil Action No. 99–CV0667.[2]

3. The District Court found that the customers of Sunpoint were in need of the protection afforded by the Securities Investor Protection Act ("SIPA").[3]

4. The Order appointed Robert G. Richardson, Trustee ("Trustee") to liquidate Sunpoint pursuant to SIPA and transferred the liquidation of Sunpoint to the United States Bankruptcy Court for the Eastern District of Texas, Tyler Division, for all further proceedings.[4]

5. According to applicable administration regulations, the liquidation proceeding was assigned an Adversary Proceeding No.: 99–6073.[5]

*Parties and Background*

6. Defendant Cheshier & Fuller L.L.P. ("C & F") is an accounting and auditing firm.

7. C & F was a properly registered Texas Limited Liability Partnership from March, 1996 until March, 1998.[6]

8. C & F existed as a general partnership from March, 1998 until June, 1999.[7]

9. From October 1, 1997 through the Decree Date, the partners of C & F were King Bourland ("Bourland"), Jeff Cheshier ("Cheshier"), Jack Sprawls ("Sprawls"),

---

1. Stipulated fact no. 1.

2. Stipulated fact no. 2.

3. *Id.*

4. *Id.*

5. *Id.*

6. See *Order Granting in Part and Denying in Part Cross–Motion for Summary Judgment Filed by the Non–Auditing Defendants* entered on December 10, 2001 (dkt # 79).

7. See *Memorandum of Decision Regarding Competing Motions for Partial Summary Judgment* entered on December 10, 2001 (dkt # 80) at p. 11.

Harold Fuller ("Fuller"),[8] James Connor ("Connor"), Jack Savage ("Savage") and Brett Robertson ("Robertson").[9]

10. Third-party Defendant Van Lewis, III, a.k.a. Van Lewis, Jr. ("Lewis") is an individual who resided within the State of Texas from at least January 1, 1996 through the Decree Date.[10]

11. From November 1, 1996 through at least February, 1999, Lewis was the sole member of the Board of Directors and the largest shareholder of Sunpoint, as well as either its CEO or President.[11]

12. Lewis owned and/or controlled several companies and corporations, including (i) Sunpoint Aviation, Inc., (ii) Sunpoint Insurance, Inc., a/k/a Sunpoint Insurance Agency, Inc. ("Sunpoint Insurance"), (iii) Sunpoint Air Transport, Inc., (iv) Sunpoint Institute of Aeronautics, Inc., (v) Judith Ann Guess, Inc., d/b/a New Territory, (vi) Van Lewis, Inc. a/k/a Van Lewis III, Inc., (vii) Financial Firms Exchange, Inc. and (viii) Moonshadow, L.L.P. (collectively, the "Lewis Affiliates").[12]

13. Third-party Defendant Mary Ellen Wilder ("Wilder") was an individual who resided within the State of Texas from November 1, 1996 through the Decree Date.[13]

14. From Nov. 1, 1996 through the Decree Date, Wilder was the CFO of Sunpoint. She was also the Financial and Operations Principal ("FINOP").[14]

15. Third-party Defendant Doug Dieter ("Dieter") is an individual who resided within the State of Texas from 1997 through the Decree Date.[15]

16. From late 1997 through the Decree Date, Dieter worked as an employee of Sunpoint reporting to Wilder, and was responsible for the daily wiring of funds into and out of Sunpoint's money market accounts at Alliance.[16]

17. Sunpoint was a publicly traded corporation. From at least January 1, 1997, Sunpoint had public shareholders who were not involved in its management or operations.[17]

18. At all relevant times Lewis owned a sufficient number of Sunpoint shares to control the composition of the board of directors.[18]

19. Sunpoint began acting as the clearing broker for its customers in June of 1997, after receiving authorization to assume such status from the National Association of Securities Dealers ("NASD").[19]

---

8. Harold R. Fuller passed away after the commencement of this case. Stanley Seat, as successor independent executor of the decedent's estate of Mr. Fuller, subsequently reached a settlement agreement with the Trustee.

9. Stipulated fact no. 3.

10. Stipulated fact no. 32; Trial Tr. vol. 1, 114–15, Oct. 17, 2005.

11. Stipulated fact no. 32; Trial Tr. vol. 1, 114–15. Additional Directors were named in February, 1999, though the new directors themselves were not informed of their appointments until the summer of 1999.

12. Trial Tr. vol. 1, 236; Plaintiffs' Exhibit 629.

13. Stipulated fact no. 33. Subsequent to the commencement of this case, Wilder passed away.

14. *Id.*

15. Stipulated fact no. 34.

16. *Id.*

17. Trial Tr. vol. 1, 114; Trial Tr. vol. 4, 42–43, Oct. 20, 2005; Plaintiffs' Exhibit 629.

18. Plaintiffs' Exhibit 629. Note that Sunpoint did not allow cumulative voting.

19. Stipulated fact no. 8.

20. The NASD conducts a rigorous evaluation before, and examination upon, allowing a non-clearing broker-dealer to become a clearing broker-dealer.[20]

21. As a result of achieving the status of clearing broker-dealer for its customers, Sunpoint was authorized to exercise control over its customers' cash and securities.[21]

22. As part of its operations as a clearing broker-dealer, Sunpoint began using the Phase 3 system, a securities processing database and computer system that allows a broker-dealer to record customer transactions and communicate with securities clearing houses, depositories, and other industry participants.[22]

23. The Phase 3 system and database are offered and maintained by Sungard Brokerage Systems, which is referred to in the securities industry as a service bureau.[23]

24. The Phase 3 system is widely used in the securities industry by clearing broker-dealers.[24]

*Alliance Money Market Fund*

25. While operating as a self-clearing broker-dealer, Sunpoint offered each of its customers the ability to have their cash automatically invested in a money market mutual fund when the cash was not committed to make a securities purchase.[25]

26. A variety of money market mutual funds offered by Alliance Fund Services ("Alliance") were made available to Sunpoint customers for the automatic sweep arrangement.[26]

27. One of those funds, the Alliance Capital Reserve Fund, held the majority of the money market shares purchased by Sunpoint customers through the automatic sweep arrangement.[27]

28. Through an automatic sweep arrangement, idle cash held by Sunpoint for the benefit of a customer could be automatically swept from the customer's account at Sunpoint on a daily basis to purchase shares in a money market mutual fund at Alliance.[28]

29. The automatic sweep arrangement could also function in the opposite direction, creating an automatic sale or redemption of money market mutual fund shares on behalf of the Sunpoint customer to generate cash that would be transferred into the customer's account to pay for securities purchased by the customer.[29]

30. The automatic sweep arrangement would also liquidate a customer's holdings in Alliance if the cash were required to satisfy a margin call or there were another need for cash in the customer's brokerage account at Sunpoint.[30]

31. As part of the automatic sweep arrangement, Sunpoint accounting personnel

**20.** Trial Tr. vol. 9, 66–68, 135–40, Nov. 3, 2005.

**21.** Stipulated fact no. 9.

**22.** Trial Tr. vol. 1, 209–10; Trial Tr. vol. 6, 162, Oct. 31, 2005; Trial Tr. vol. 8, 9–11, Nov. 2, 2005.

**23.** Trial Tr. vol. 1, 209–10; Trial Tr. vol. 6, 162; Trial Tr. vol. 8, 9–11.

**24.** Trial Tr. vol. 1, 209–10; Trial Tr. vol. 6, 162; Trial Tr. vol. 8, 9–11.

**25.** Stipulated fact no. 11.

**26.** Stipulated fact no. 12.

**27.** *Id.*

**28.** Trial Tr. vol. 6, 212–13; Trial Tr. vol. 8, 17–19, 30–31.

**29.** Trial Tr. vol. 6, 212–13; Trial Tr. vol. 8, 17–19, 30–31.

**30.** Trial Tr. vol. 8, 59.

daily calculated, based on customer transactions, a single net amount due to be wired into or out of each of the various money market mutual funds offered by Alliance (collectively the "Alliance Fund").[31]

32. On the same day as the net wire, Sunpoint transmitted information to Alliance segregating the net wire into the amount attributable to purchases and sales of shares in each Alliance Fund. This information was sent in the form of a handwritten worksheet completed by a Sunpoint employee and faxed daily to Alliance.[32]

33. The Alliance Fund shares purchased by Sunpoint customers through the sweep arrangement were held at Alliance in an account ("Alliance Account") titled in the name of Sunpoint rather than in the individual names of the Sunpoint customers who owned the shares. The number of Alliance Fund shares owned by each Sunpoint customer was reflected on Sunpoint's records, but not on Alliance's records.[33]

34. Sunpoint customers had the ability to write checks upon, and make Visa card withdrawals from, their Alliance money market holdings. Those transactions by customers resulted in a liquidation of money market shares by Alliance based upon information received by Alliance from a third party bank responsible for paying on those checks and Visa card withdrawals. Alliance then transmitted that same information reflecting customer check and Visa card transactions to Sunpoint through Sunpoint's Phase 3 database of customer activity maintained by Sunguard.[34]

35. Although Alliance "cleared" the customer check or Visa card transaction against the Alliance Account in the name of Sunpoint, Alliance did not know if the customers had sufficient Alliance money market assets to cover those transactions.[35]

36. The Phase 3 database would produce a report for Sunpoint personnel identifying all customer check and Visa card transactions cleared by Alliance against the Sunpoint account at Alliance.[36]

37. Sunpoint personnel were required to notify Alliance if a customer did not have sufficient Alliance money market shares in the customer's brokerage account to cover the transaction.[37]

38. If the customer did not have sufficient Alliance Fund shares, Sunpoint personnel would notify Alliance and Alliance would give instructions to the third party bank to return the check and Alliance would reverse the earlier liquidation of shares in the Alliance Fund maintained in the name of Sunpoint.[38]

39. The fact that Alliance could give instructions to the clearing bank to return, for insufficient funds, a customer's check on the customer's checking account did not constitute evidence that the sweep shares were not held on an omnibus basis in a Sunpoint account at Alliance.[39]

40. The Sunpoint customers received monthly statements of their accounts from Sunpoint, and each statement reflected the number of Alliance Fund shares that should have been held in the Sunpoint

---

31. Trial Tr. vol. 2, 118–21, Oct. 18, 2005.

32. *Id.*

33. Trial Tr. vol. 2, 117; Trial Tr. vol. 8, 25–26.

34. Trial Tr. vol. 8, 307, 309.

35. Trial Tr. vol. 8, 299–300.

36. *Id.*

37. *Id.*

38. *Id.*

39. *Id.* at 300–01.

account at Alliance on behalf of that particular Sunpoint customer.[40]

41. Each monthly customer statement reflected the sweep transactions in and out of Alliance in a chronological reporting of all of the customer's transactions of any kind as recorded in the Phase 3 database.[41]

42. The customer statement was generated by a statement vendor/printing company based upon data transmitted to it by Sunpoint from the Phase 3 database.[42]

43. Each monthly customer statement contained language stating that all of the transactions shown on the statement were cleared by Sunpoint, and all cash and securities positions shown on the statement were carried or held by Sunpoint.[43] Such language was inaccurate not only as to Alliance but also as to many other positions on the statements.[44]

44. At all times relevant to the present action, the balance of funds which should have been present in the Alliance Account constituted a material balance in comparison to other balances related to Sunpoint's financial statements.

*The Misappropriation of Customer Assets by Lewis*

45. Sunpoint accounting records reflect a steady stream of cash disbursements from Sunpoint bank accounts to Lewis and the Lewis Affiliates.[45]

46. The misappropriation of customer cash first occurred out of Sunpoint's accounts at City National Bank ("CNB") through the transfer of funds in excess of the aggregate amount of the cash in those accounts constituting Sunpoint's corporate assets. When Sunpoint's cash was insufficient to cover the improper transfers to Lewis and the Lewis Affiliates, the cash used to make those disbursements belonged to Sunpoint customers.[46]

47. By at least November, 1997, Lewis began to misappropriate, or induced others employed by Sunpoint to misappropriate on his behalf, customer assets that should have been invested in the Alliance Account.[47]

48. The misappropriations from the Alliance Account were achieved using the daily sweep of cash into and out of the Alliance Account.[48]

49. If the net result of customer transactions in the Alliance Account called for a net redemption of money market shares for the day, and therefore a net withdrawal of cash from the Alliance Account, then a Sunpoint employee, at the direction of Lewis, would increase the amount of funds wire-transferred from the Alliance Account to an account at Mercantile Bank (the "Mercantile Account") by the amount to be misappropriated.[49]

50. If the net result of customer transactions in the Alliance Account called for a net purchase of money market fund shares for the day, and therefore a net deposit of cash into the Alliance Account, then a Sunpoint employee, at the direction of Lewis, would decrease the amount of funds wire-transferred to the Alliance Account from

40. Stipulated fact no. 13.

41. Plaintiffs' Exhibit 14.

42. Trial Tr. vol. 8, 27, 309.

43. Plaintiffs' Exhibits 14, 18, 70, and 87.

44. Trial Tr. vol. 1, 220–25.

45. Trial Tr. vol. 2, 217–23.

46. Trial Tr. vol. 3, 144–46, Oct. 19, 2005.

47. Trial Tr. vol. 2, 250–51.

48. Trial Tr. vol. 2, 96–97, 99–100.

49. Trial Tr. vol. 2, 95–100.

the Mercantile Account by the amount to be misappropriated.[50]

51. Such customer cash improperly held back or withdrawn from the Alliance Account was then available in the Mercantile Account for misappropriation either through wire transfers out of the Mercantile Account to third party bank accounts for the benefit of Lewis, or by wire transfers to Sunpoint bank accounts where it would then be dissipated.[51]

52. As of the Decree Date, $25,374,952.19 in Sunpoint customer cash, which should have been invested in the Alliance Account, had been misappropriated by Lewis.[52]

53. The misappropriations of customer cash from the Alliance Account were not perpetrated for the benefit of Sunpoint.

54. The misappropriations of customer cash from the Alliance Account did not further the legitimate business objectives of Sunpoint and were detrimental to its longterm existence.

55. Though Lewis may have elected on occasion to infuse Sunpoint with cash that he, or others at his request, misappropriated from the Alliance Account, such actions were taken in order to further Lewis' own personal financial agenda and any benefit received by Sunpoint was merely incidental to the successful completion of that agenda.

56. There were officers of Sunpoint who were unaware of the misappropriation of customer funds at Sunpoint and who would have reported the misappropriation to the appropriate authorities if they had been aware of any misappropriation.[53]

57. Diane Childers was the vice-president of compliance at Sunpoint from October, 1997 until December, 1998. She was unaware of the misappropriation of customer funds at Sunpoint and she would have reported the misappropriation to the appropriate authorities if she had been aware of any misappropriation.[54]

58. Brett Hagen was the Chief Operating Officer at Sunpoint from January, 1999 until November, 1999. He was unaware of the misappropriation of customer funds at Sunpoint and he would have reported the misappropriation to the appropriate authorities if he had been aware of any misappropriation.[55]

59. Brett Hagen, John Pope, Wayne Smith, Marvin Sapaugh, and Wilder were appointed to the Sunpoint board of directors in February, 1999. Their roles as board members are not germane to this action because they were not involved in such roles at the time of C & F's conduct alleged to give rise to damages.[56]

*Relationship Between C & F and Sunpoint*

60. Pursuant to an engagement agreement between C & F and Sunpoint dated October 28, 1997, subsequently superseded

**50.** Trial Tr. vol. 2, 95–100.

**51.** Trial Tr. vol. 2, 95–100.

**52.** Trial Tr. vol. 2, 206.

**53.** Trial Tr. vol. 2, 273–75; Trial Tr. vol. 8, 320. The Plaintiffs also contend that there were directors of Sunpoint who were also unaware but would have disclosed the misappropriations if they had been aware. The record indicates that Van Lewis was the only director at Sunpoint until February, 1999, at which time several other people were named as directors, though they were not informed of their appointment until some time later. *See* Trial Tr. vol. 1, 238; Plaintiffs' Exhibit 629.

**54.** Trial Tr. vol. 2, 273–75.

**55.** Trial Tr. vol. 8, 320; Plaintiffs Exhibit 238.

**56.** Trial Tr. vol. 1, 114–15.

by an agreement dated December 2, 1997, C & F agreed to perform the annual audit of Sunpoint's financial statements for the fiscal year ending October 31, 1997 ("1997 Audit").[57]

61. Also pursuant to the 1997 agreement, Sunpoint agreed to provide C & F with the basic information necessary for its audit, and to accept responsibility for the accuracy and completeness of that information, as well as the financial statements.[58]

62. The provisions of the engagement letters and the appendices thereto are all integral parts of the contracts between C & F and Sunpoint.[59]

63. C & F issued an audit opinion relating to Sunpoint dated December 16, 1997, with the addition of notes 19 and 20 to the financial statements dated December 29 and 31, 1997, respectively (the "1997 Opinion").[60]

64. Auditors are responsible for their audit opinions, whereas management is responsible for accurately preparing financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). The notes which accompany properly prepared financial statements, while the responsibility of management, are often prepared in whole or part by external auditors.[61]

65. Auditors of companies in the securities industry are also responsible for the Independent Auditors' Report on Internal Control Structure ("Internal Control Report"), as required by Securities and Exchange Commission ("SEC") Rule 17a–5.[62]

66. C & F compiled a report pursuant to SEC Rule 17a–5 for the 1997 fiscal year. The report contained the 1997 Opinion, Sunpoint's financial statements with accompanying notes, supporting schedules required by SEC rules, and the Internal Control Report. (The 1997 Rule 17a–5 report is referred to herein as the "1997 Audit Report").[63]

67. At all times relevant to this Proceeding, C & F, Bourland and Cheshier held themselves out as possessing the skill, ability and expertise expected of certified public accountants in accounting and auditing matters and as being qualified to (i) audit in accordance with Generally Accepted Auditing Standards ("GAAS") the financial statements of firms engaged in the securities business; (ii) express opinions in accordance with GAAP with respect to the financial statements of such firms as fairly reflecting their financial condition and results of operations; and (iii) as being familiar with accounting and auditing practices and standards required by the SEC and the NASD for firms engaged in the securities business.[64]

68. At all times relevant to this Proceeding, C & F, Bourland and Cheshier held themselves out as possessing the skill, ability and expertise expected of certified public accountants in accounting and auditing matters and as being qualified to assist

---

57. Stipulated fact no. 15.

58. Defendants' Exhibit 4. While Plaintiffs contend that such representations were analogous to "whereas" clauses in a contract, and did not actually constitute any contractual responsibility as to Sunpoint, the Court rejects such a reading of the engagement letters and finds that the contract provisions, including those included in the appendices, were all integral parts of the engagement contract.

59. *See* Plaintiffs' Exhibits 22 and 23.

60. Stipulated fact no. 16.

61. Trial Tr. vol. 7, 16–17, Nov. 1, 2005; Trial Tr. vol. 8, 149.

62. 17 C.F.R. § 240.17a–5 (2005).

63. Trial Tr. vol. 3, 93–97; Trial Tr. vol. 6, 50; Plaintiffs' Exhibits 27 and 29.

64. Stipulated fact no. 22.

in the preparation of financial statements and notes thereto, and prepare reports concerning the books and records of a clearing broker-dealer as required by Section 17 of the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder.[65]

69. Sunpoint, the NASD, and the SEC relied on C & F to apply the proper standards and expertise, to express the opinions, to make the certifications and to prepare or assist in the preparation of the reports discussed herein for the purposes, among others, of:

(a) obtaining reasonable assurance of the accuracy of financial data submitted directly or indirectly to the SEC, NASD, and Sunpoint's customers, thereby protecting Sunpoint from fraudulent activity by its officers, directors, agents, and employees and safeguarding Sunpoint's assets and assets held by Sunpoint on behalf of its customers;

(b) determining whether Sunpoint could continue to engage in business as a securities broker-dealer;

(c) determining whether significant restrictions on the scope and nature of its operations would be required in order for Sunpoint to continue operating as a securities broker-dealer; and

(d) making informed business decisions concerning the future operations of Sunpoint and customer involvement with Sunpoint based on reasonably reliable financial information.[66]

70. Pursuant to an engagement agreement between C & F and Sunpoint dated October 20, 1998, C & F agreed to perform the annual audit of Sunpoint's financial statements for the fiscal year ending October 31, 1998 ("1998 Audit").[67]

71. Also pursuant to the 1998 agreement, Sunpoint agreed to provide C & F with the basic information necessary for its audit, and to accept responsibility for the accuracy and completeness of that information, as well as the financial statements.[68]

72. C & F issued an audit opinion relating to Sunpoint dated November 19, 1998, which was originally issued on January 21, 1999 (the "1998 Opinion").[69]

73. C & F compiled a report pursuant to SEC Rule 17a–5 for the 1998 fiscal year. The report contained the 1998 Opinion, Sunpoint's financial statements with accompanying notes, supporting schedules required by SEC rules, and the Internal Control Report. (The 1998 Rule 17a–5 report is referred to herein as the "1998 Audit Report").[70]

74. Pursuant to the engagement agreement dated October 20, 1998, C & F also agreed to perform services related to the preparation and filing of a Form 10–SB on behalf of Sunpoint and with the SEC.[71]

75. C & F assisted Sunpoint in the preparation of the Form 10–SB filed by Sunpoint with the SEC in June 1999.[72]

*C & F's Audits of Sunpoint*

*The 1997 Audit*

76. During C & F's performance of the 1997 Audit, C & F knew that Sunpoint

---

**65.** Trial Tr. vol. 6, 34–35.

**66.** Trial Tr. vol. 3, 52–53; Trial Tr. vol. 5, 12–13, Oct. 21, 2005; Trial Tr. vol. 8, 133; Trial Tr. vol. 9, 41.

**67.** Stipulated fact no. 17.

**68.** Defendants' Exhibit 52.

**69.** Stipulated fact no. 18.

**70.** Trial Tr. vol. 3, 98; Plaintiffs' Exhibits 28 and 30.

**71.** Trial Tr. vol. 7, 250.

**72.** Trial Tr. vol. 7, 197–98.

customer funds were invested in the Alliance Fund.[73]

77. The C & F audit work papers contained some evidence that Sunpoint controlled the Alliance Account.[74]

78. The C & F audit workpapers for the 1997 Audit contained some evidence that was contradictory to Cheshier's stated belief that the Alliance Account was a non-custodial account.[75]

79. During the 1997 Audit, C & F failed to confirm that the actual number of Alliance Fund shares held in the Sunpoint account at Alliance and the number of Alliance Fund shares held by customers as reflected in the Phase 3 customer records maintained by Sunpoint were equivalent.[76]

80. During C & F's performance of the 1997 Audit, C & F knew that Sunpoint could exercise control over funds in the Alliance account, and could also direct the redemption of Alliance fund shares.[77]

81. During C & F's performance of the 1997 Audit, C & F should have known that Sunpoint could carry out "same day" transactions in customer holdings of Alliance Fund shares.[78]

82. Same day transactions in money market sweep shares could only be made in the Phase 3 system if the money market account at the fund was in the name of, and controlled by, the broker-dealer, but not if the money market account at the fund is in the name of the broker's customer.[79]

83. C & F therefore should have known during the 1997 Audit that customer shares in the Alliance Fund were held in an account at Alliance, in the name of, and controlled by, Sunpoint.[80]

84. During the 1997 Audit, C & F failed to obtain an adequate understanding of how customer transactions in Alliance Fund shares were executed, including the transfer of customer cash from a bank account controlled by Sunpoint to a bank account controlled by Alliance and vice versa.[81]

85. A reasonably prudent auditor would have gained an understanding of the mechanics of the Alliance sweep arrangement directed by Sunpoint, given the magnitude of those transactions.

86. Rule 17a–5(d)(3) requires that certain schedules reflecting computations of net capital requirements, customer reserve rules, and possession and control reports be included with a broker-dealer's annually filed audit statements.[82]

87. During the 1997 Audit, C & F properly reviewed Sunpoint's customer reserve compliance, examined internal control procedures for customer reserve calculations, prepared customer reserve calculations, and studied and tested Sun-

---

73. Stipulated fact no. 26.

74. Trial Tr. vol. 3, 237–41, 262–66; Trial Tr. vol. 6, 184–94; Plaintiffs' Exhibits 12, 14, 16, and 18.

75. Trial Tr. vol. 3, 237–41, 262–66; Trial Tr. vol. 6, 184–94; Plaintiffs' Exhibits 12, 14, 18, 49, 70, and 87.

76. Stipulated fact no. 27.

77. Trial Tr. vol. 3, 285–86; Trial Tr. vol. 8, 46; Plaintiffs' Exhibits 12 and 49.

78. Trial Tr. vol. 7, 242–44.

79. Trial Tr. vol. 8, 46.

80. Trial Tr. vol. 7, 242–44; Trial Tr. vol. 8, 46; Plaintiffs' Exhibits 87 and 499.

81. Trial Tr. vol. 3, 258–61; Trial Tr. vol. 6, 179–80; Trial Tr. vol. 8, 137–45.

82. 17 C.F.R. § 240.17a–5(d)(3).

point's practices regarding customer reserve.[83]

88. In the process of auditing Sunpoint's customer reserve calculations, C & F discovered that Sunpoint was in violation of the customer reserve rule, after which C & F notified the NASD by telephone of the violation.

89. C & F adequately assured that the customer reserve violation was reported in the 1997 Audit Report at Note 2, noting a deficiency in excess of $560,000 as a material weakness.[84]

90. There is no requirement that a firm must have assets available within the firm at the time of the calculation in order to meet its requirements under the customer reserve calculation. Rather, those requirements must be met at a specified time subsequent to the calculation.[85]

91. Even if the amount of money necessary to meet the requirements of the customer reserve calculation was required to be available within the firm at the time of the calculation, the notes to the financial statements contained in the 1997 Audit Opinion disclosed that Sunpoint did not have available unencumbered assets at the time of the calculation on October 31, 1997, and sophisticated users of the financial statements, including the SEC and its designated self-regulatory organization, the

NASD, were charged with knowledge of that circumstance.[86]

92. The 1997 Opinion contained what is known as a going-concern notification. The 1997 Opinion stated that due to recurring losses and then on-going litigation, there was substantial doubt as to the reliability of the fundamental accounting assumption that Sunpoint could continue as a going concern.[87]

93. In the 1997 Opinion, C & F represented that (i) C & F had conducted its audits in accordance with GAAS; (ii) the audits C & F performed provided a reasonable basis for its opinions; and (iii) in C & F's opinion, Sunpoint's financial statements presented fairly, in all material respects, the financial position of Sunpoint as of the date referenced in the respective opinions in conformity with GAAP.[88]

94. The SEC and the NASD received copies of the 1997 Audit Report, as C & F knew they would.[89]

95. C & F knew that the SEC and the NASD would rely on the information in the 1997 Audit Report.[90]

96. The SEC and the NASD relied on the information in the 1997 Audit Report.[91]

97. Following the issuance of the 1997 Audit Report, C & F signed, in accordance with Rule 17a–5(c), a separate opinion on

---

83. Trial Tr. vol. 8, 138–46.

84. Plaintiffs' Exhibit 29.

85. Trial Tr. vol. 10, 59–60, Nov. 4, 2005. This is contrary to the opinion expressed by the Plaintiffs' expert, Mr. Mottola. *See also* Plaintiffs' Exhibit 12, p. 5, wherein the NASD examines balances available on June 30, 1997, a Monday, to guide its analysis of a potential customer reserve violation, constituting evidence that the relevant balance is the Monday balance, not the Friday balance of available funds.

86. *See* Plaintiffs' Exhibit 29. Note that the notes to the financial statements are an inte-

gral part of any financial statement. Trial Tr. vol. 3, 66; Trial Tr. vol. 8, 147.

87. Trial Tr. vol. 3, 198–99; Plaintiffs' Exhibit 29, p. 5.

88. Stipulated fact no. 28.

89. Stipulated fact no. 29; Defendants' Exhibit 201.

90. Stipulated fact no. 30.

91. *Id.*

Sunpoint's statement of financial condition specifically meant for delivery to Sunpoint customers. This opinion did not include a paragraph referring to the report on internal control and other materials included in the 1997 Audit Report filed with the SEC and the NASD. This separate, shorter opinion was included with the statement of financial condition in the brochure mailed to Sunpoint customers.[92]

98. C & F also drafted, or assisted in the drafting of, the notes to the financial statements covered by the 1997 Opinion.[93]

99. The 1997 statement of financial condition sent to Sunpoint customers with the 1997 Opinion did not contain any notification that C & F had commented on material inadequacies as required by Rule 17a-5(c)(2)(iii). That rule requires the *broker-dealer* to make such a disclosure.[94]

100. Sunpoint customers did not receive notification that C & F found material inadequacies in the internal controls in place at Sunpoint during the 1997 Audit.[95]

101. The 1997 statement of financial condition did not disclose that the approximately $1.7 million net capital violation as of October 31, 1997 was caused in part by Lewis' pledge of $969,000 in Sunpoint certificates of deposit ("Sunpoint CDs") to secure loans to Lewis personally and to the Lewis Affiliates, and the redemption of a $109,000 Sunpoint CD by Lewis.[96]

102. The 1997 statement of financial condition did not disclose that Lewis had pledged more than $1 million in Sunpoint CDs without telling Wilder.[97]

103. The 1997 statement of financial condition did not disclose that the approximately $1.7 million net capital violation was caused in part by the fact that approximately $635,000, which was reflected in Sunpoint accounting records as on deposit at CNB, was not actually there.[98]

104. C & F knew that Sunpoint's customers would receive a statement of financial condition, including the shortened version of the 1997 Opinion.[99]

105. Sunpoint's customers received copies of the statement of financial condition, including the shortened version of the 1997 Opinion.[100]

106. The C & F Audit Program for General Procedures established as one of the "audit objectives" that there would be a search for, and evaluation of, related party transactions.[101]

107. The check register for Sunpoint's operating checking account reflected payments to Lewis and the Lewis Affiliates in the approximate total amount of $900,000 in Sunpoint's fiscal year 1997.[102]

108. The 1997 audited financial statements only disclosed $205,424 in related

92. Trial Tr. vol. 6, 58, 225–26; Plaintiffs' Exhibits 29 and 632.

93. Trial Tr. vol. 8, 147–51.

94. Trial Tr. vol. 8, 264–65.

95. *Id.*

96. Plaintiffs' Exhibits 632 and 634.

97. Trial Tr. vol. 8, 184–85; Plaintiffs' Exhibits 632 and 634.

98. Trial Tr. vol. 8, 182–85, 205–06. The evidence does not establish whether this discrepancy was actually caused by accounting error or wrongful withdrawal.

99. Trial Tr. vol. 6, 56–57; Trial Tr. vol. 8, 182–83.

100. Trial Tr. vol. 4, 231–32; Trial Tr. vol. 10, 11.

101. Plaintiffs' Exhibit 34.

102. Trial Tr. vol. 2, 222–24.

party transactions for the fiscal year ending October 31, 1997.[103]

109. During the 1997 Audit, C & F learned that approximately $969,000 in Sunpoint CDs had been pledged by Lewis, without the knowledge of Sunpoint's CFO and FINOP, to secure loans to himself and to some of the Lewis Affiliates.[104]

110. During the 1997 Audit, C & F learned that Lewis, without the knowledge of Sunpoint's CFO and FINOP, had liquidated a Sunpoint CD in the amount of approximately $109,000 and personally used the proceeds.[105]

111. Despite the fact that C & F learned during the 1997 Audit that more than $1,000,000 in related party transactions had not been recorded in Sunpoint's books, C & F did not review the operating account check register to determine if there were additional undisclosed related party transactions.[106]

*The 1998 Audit*

112. During C & F's performance of the 1998 Audit, C & F knew that Sunpoint customer funds were invested in the Alliance Fund.[107]

113. The C & F audit work papers contained some evidence of the fact that Sunpoint controlled the Alliance Account.[108]

114. The C & F audit workpapers for the 1998 Audit contained some evidence that was contradictory to Cheshier's stated belief that the Alliance Account was a non-custodial account.[109]

115. During the 1998 Audit, C & F failed to confirm that the actual number of Alliance Fund shares held in the Sunpoint account at Alliance and the number of Alliance Fund shares held by customers as reflected in the Phase 3 customer records maintained by Sunpoint were equivalent.[110]

116. During C & F's performance of the 1998 Audit, C & F knew that Sunpoint could exercise control over funds in the Alliance Account, and could also direct the redemption of Alliance Fund shares.[111]

117. During C & F's performance of the 1998 Audit, C & F should have known that Sunpoint could carry out "same day" transactions in customer holdings of Alliance Fund shares.[112]

118. Same day transactions in money market sweep shares could only be made in the Phase 3 system if the money market account at the fund was in the name of, and controlled by, the broker-dealer, but not if the money market account at the fund is in the name of the broker's customer.[113]

119. C & F therefore should have known during the 1998 Audit that customer shares in the Alliance Fund were held

103. Plaintiffs' Exhibit 29.

104. Trial Tr. vol. 6, 99; Plaintiffs' Exhibit 42.

105. Trial Tr. vol. 6, 99; Trial Tr. vol. 7, 295–96; Plaintiffs' Exhibit 42.

106. Trial Tr. vol. 2, 223–24; Trial Tr. vol. 7, 288–98; Plaintiffs' Exhibit 91.

107. Stipulated fact no. 26.

108. Trial Tr. vol. 3, 237–41, 262–66; Trial Tr. vol. 6, 184–94; Plaintiffs' Exhibits 12, 14, 16, and 18.

109. Trial Tr. vol. 3, 237–41, 262–66; Trial Tr. vol. 6, 184–94; Plaintiffs' Exhibits 12, 14, 18, 49, 70, and 87.

110. Stipulated fact no. 27.

111. Trial Tr. vol. 3, 285–86; Trial Tr. vol. 8, 46; Plaintiffs' Exhibits 12 and 49.

112. Trial Tr. vol. 7, 242–44.

113. Trial Tr. vol. 8, 46.

in an account at Alliance, in the name of, and controlled by Sunpoint.[114]

120. During the 1998 Audit, C & F failed to obtain an adequate understanding of how customer transactions in Alliance Fund shares were executed, including the transfer of customer cash from a bank account controlled by Sunpoint to a bank account controlled by Alliance and vice versa.[115]

121. A reasonably prudent auditor would have gained an understanding of the mechanics of the Alliance sweep arrangement directed by Sunpoint, given the volume and frequency of those transactions.

122. In the 1998 Opinion, C & F represented that (i) C & F had conducted its audits in accordance with GAAS; (ii) the audits C & F performed provided a reasonable basis for its opinions; and (iii) in C & F's opinion, Sunpoint's financial statements presented fairly, in all material respects, the financial position of Sunpoint as of the date referenced in the respective opinions in conformity with GAAP.[116]

123. The SEC and the NASD received copies of the 1998 Audit Report, as C & F knew they would.[117]

124. C & F knew that the SEC and the NASD would rely on the information in the 1998 Audit Report.[118]

125. The SEC and the NASD relied on the information in the 1998 Audit Report.[119]

126. Following the issuance of the 1998 Audit Report, C & F signed, in accordance with Rule 17a–5(c), a separate opinion on Sunpoint's statement of financial condition specifically meant for delivery to Sunpoint customers. This opinion did not include a paragraph referring to the report on internal control and other materials included in the 1998 Audit Report filed with the SEC and the NASD. This separate, shorter opinion was included with the statement of financial condition in the brochure mailed to Sunpoint customers.[120]

127. C & F also drafted, or assisted in the drafting of, the notes to the financial statements covered by the 1998 Opinion.[121]

128. The 1998 statement of financial condition sent to Sunpoint customers with the 1998 Opinion did not contain any notification that C & F had commented on material inadequacies as required by Rule 17a–5(c)(2)(iii). That rule requires the *broker-dealer* to make such a disclosure.[122]

129. Sunpoint customers did not receive notification that C & F found material inadequacies in the internal controls in place at Sunpoint during the 1998 Audit.[123]

130. The 1998 statement of financial condition did not disclose that Lewis had pledged more than $1 million in Sunpoint CDs without telling Wilder.[124]

131. The 1998 statement of financial condition did not disclose that the approxi-

114. Trial Tr. vol. 7, 242–44; Trial Tr. vol. 8, 46; Plaintiffs' Exhibits 87 and 499.

115. Trial Tr. vol. 3, 258–61; Trial Tr. vol. 6, 179–80; Trial Tr. vol. 8, 137–45.

116. Stipulated fact no. 28.

117. Stipulated fact no. 29; Defendants' Exhibit 201.

118. Stipulated fact no. 30.

119. *Id.*

120. Trial Tr. vol. 6, 225–26; Plaintiffs' Exhibits 30 and 634.

121. Trial Tr. vol. 8, 147–51.

122. Trial Tr. vol. 8, 264–65.

123. *Id.*

124. Trial Tr. vol. 8, 184–85; Plaintiffs' Exhibits 632 and 634.

mately $1.7 million net capital violation was caused in part by the fact that approximately $635,000, which was reflected in Sunpoint accounting records as on deposit at CNB, was not actually there.[125]

132. C & F knew that Sunpoint's customers would receive copies of the statement of financial condition, including the shortened version of the 1998 Opinion.[126]

133. Sunpoint's customers received copies of the statement of financial condition, including the shortened version of the 1998 Opinion.[127]

134. The C & F Audit Program for General Procedures established as one of the "audit objectives" that there would be a search for, and evaluation of, related party transactions.[128]

135. C & F workpapers for the 1997 Audit contained a copy of the November 1997 check register for Sunpoint's operating checking account.[129]

136. The November 1997 check register contained in C & F's 1997 audit workpapers showed more than $150,000 in payments by Sunpoint to the Lewis affiliate, Sunpoint Insurance.[130]

137. The 1998 audited financial statements did not disclose any related party transactions between Sunpoint and Sunpoint Insurance.[131]

138. The check register for Sunpoint's operating checking account reflected payments to Lewis and the Lewis Affiliates in the approximate total amount of $1.5 million in Sunpoint's fiscal year 1998.[132]

139. The 1998 audited financial statements only disclosed $494,636 in related party transactions for the fiscal year ending October 31, 1998.[133]

*Net Capital Deficiency*

140. As a clearing securities broker-dealer, Sunpoint was required to maintain a certain level of capital. C & F was aware of this requirement.[134]

141. Prior to October 31, 1997, Lewis caused Sunpoint to pledge approximately $900,000.00 in Sunpoint CDs to secure loans made by CNB to Lewis and several of the Lewis Affiliates.[135]

142. On December 29, 1997, C & F learned that, as of October 31, 1997, Sunpoint had less net capital than the amount that was required by SEC Rule 15c3–1. Thus, additional capital had to be immediately contributed to Sunpoint to bring Sunpoint into net capital compliance.[136]

143. On December 29, 1997, CNB informed C & F that approximately $900,000.00 in Sunpoint CDs were pledged to CNB to secure loans to Lewis and some of the Lewis Affiliates.[137]

**125.** Trial Tr. vol. 8, 182–85, 205–06. The evidence does not establish whether this discrepancy was actually caused by accounting error or wrongful withdrawal.

**126.** Trial Tr. vol. 6, 56–57; Trial Tr. vol. 8, 182.

**127.** Trial Tr. vol. 4, 231–32; Trial Tr. vol. 10, 11.

**128.** Plaintiffs' Exhibit 34.

**129.** Trial Tr. vol. 6, 123–24; Plaintiffs' Exhibit 91.

**130.** Plaintiffs' Exhibit 91.

**131.** Plaintiffs' Exhibit 30, p. 19.

**132.** Trial Tr. vol. 2, 222–24.

**133.** Plaintiffs' Exhibit 30.

**134.** Trial Tr. vol. 8, 126–27.

**135.** Trial Tr. vol. 6, 90–93.

**136.** Stipulated fact no. 24.

**137.** Trial Tr. vol. 6, 90–93.

144. On December 29, 1997, CNB informed C & F that it had sent to C & F an incorrect bank balance confirmation for a particular Sunpoint account (900119) at CNB. The confirmation incorrectly showed that the account had, on October 31, 1997, a balance of $635,459.10 when it actually contained only $206.82 on that day.[138]

145. The revelation of Lewis' pledges of the Sunpoint CDs, as well as the false bank balance confirmation, showed that Sunpoint was approximately $1.7 million under its regulatory net capital requirement as of October 31, 1997.[139]

146. After C & F informed Lewis that C & F was aware of the net capital violation, Lewis transferred $744,609.11 and Sunpoint Insurance, a Lewis Affiliate, transferred $969,309.43 to Sunpoint (collectively the "Deposits").[140]

147. Lewis represented that the Deposits were capital contributions to Sunpoint that satisfied the regulatory net capital requirements.[141]

148. As part of its 1997 Audit, C & F's only investigation of the Deposits to attempt to confirm the truth of Lewis' representation that the Deposits were capital contributions that satisfied the regulatory net capital requirements was to obtain the deposit slips associated with the Deposits into the Sunpoint accounts and copies of two resolutions of the Sunpoint Board of Directors.[142]

149. Lewis was the sole director of Sunpoint at the time of the Deposits.[143]

150. The deposit slips reflected that the $744,609.11 deposit into Sunpoint's CNB account 9000119 was from CNB account 6001491 (which was Lewis' account) and the $969,309.43 deposit into Sunpoint's CNB account 60399 was from CNB account 61808 (which was a Sunpoint Insurance account).[144]

151. One of the board resolutions obtained by C & F was dated January 18, 1996 and it authorized Lewis to pledge Sunpoint assets to secure personal loans to Lewis.[145]

152. Prior to the issuance of the 1997 Opinion, C & F did not, as part of its 1997 Audit of the financial statements of Sunpoint, inquire into or investigate the original source of the approximately $1.7 million that was, in the aggregate, transferred into Sunpoint CNB account 60399 on December 30, 1997, and Sunpoint CNB account 9000119 on December 31, 1997.[146]

153. C & F participated in the preparation of notes to the audited 1997 financial statements describing the net capital violation and the transfer of approximately $1.7 million in cash on December 30 and 31, 1997.[147]

154. Prior to the issuance of the 1998 Opinion, C & F did not, as part of its audit of the financial statements of Sunpoint, inquire into or investigate the original

138. Trial Tr. vol. 6, 88–89; Plaintiffs' Exhibit 40.

139. Trial Tr. vol. 6, 98–99; Trial Tr. vol. 8, 186–87.

140. Trial Tr. vol. 1, 131–33; Trial Tr. vol. 6, 106–12.

141. Trial Tr. vol. 6, 111–12.

142. Trial Tr. vol. 6, 111–12.

143. Trial Tr. vol. 1, 114; Plaintiffs' Exhibit 629.

144. Trial Tr. vol. 1, 131–33; Trial Tr. vol. 6, 107; Plaintiffs' Exhibits 60 and 61.

145. Plaintiffs' Exhibit 20.

146. Trial Tr. vol. 6, 111–12.

147. Trial Tr. vol. 8, 148–49; Plaintiffs' Exhibit 640.

source of the approximately $1.7 million that was, in the aggregate, transferred into Sunpoint CNB account 60399 on December 30, 1997, and Sunpoint CNB account 9000119 on December 31, 1997.[148]

155. The Deposits, in the aggregate amount of $1,713,918.54, included funds misappropriated from Sunpoint customer assets in the Alliance Account and funds misappropriated from Sunpoint customer assets in a margin account at Southwest Securities, Inc. maintained in the name of Sunpoint.[149]

*Broker–Dealer Accounting Systems*

156. As designed, the Phase 3 securities processing system used by Sunpoint does not include the sweep money market positions on the stock record or location report, or on any other stock report generated by Phase 3.[150]

157. As designed, the Phase 3 securities processing system used by Sunpoint always reflected the sweep money market positions on certain cash-related reports and a set of reports showing only the sweep money market transactions and balances.[151]

158. Although Sheila Currier of Sungard (the distributor of the Phase 3 system) testified that five Phase 3 customers have manually added the sweep money market positions to their stock records since 1999, there is no evidence that any brokerdealers had manually included the sweep positions on their stock record prior

to or during the 1997 and 1998 Audits of Sunpoint by C & F.[152]

159. With respect to the five broker-dealers using Phase 3 who manually added the sweep money market positions to their stock record, those firms began doing so at the request of their internal auditors.[153]

160. C & F never requested to Sunpoint that it include sweep money market positions on its stock record or location report.[154]

161. Phase 3 does not include sweep money market positions on the stock record or location report unless expressly requested to do so by a broker-dealer.[155]

162. May Financial Corporation was another clearing broker-dealer which was audited by C & F prior to, during, and after the period of time when C & F audited Sunpoint. The securities processing system used by May Financial Corporation, referred to as "SIS," is a system similar to the Phase 3 System used by Sunpoint. The SIS System did not include the sweep money market positions on the stock record or location report generated by that processing system.[156]

163. The securities or "box" count prepared by May Financial Corporation did not include the sweep money market positions held for May Financial customers.[157]

164. There is no evidence of any securities processing system in use by any firm in the securities broker-dealer industry that, by design, reports sweep money mar-

---

148. Trial Tr. vol. 6, 111–12.

149. Trial Tr. vol. 1, 118–25; Trial Tr. vol. 8, 214–16; Plaintiffs' Exhibit 34.

150. Trial Tr. vol. 8, 72–74.

151. Trial Tr. vol. 8, 41–45.

152. Trial Tr. vol. 8, 73–75.

153. *Id.*

154. Trial Tr. vol. 7, 112–13, 210–13.

155. Trial Tr. vol. 7, 207–08; Trial Tr. vol. 8, 75.

156. Trial Tr. vol. 8, 120, 245; Trial Tr. vol. 11, 23–24, Nov. 5, 2005.

157. Trial Tr. vol. 11, 24–32.

ket positions on the stock record or location report.[158]

165. C & F's belief that the sweep money market positions of Sunpoint customers would be on the Sunpoint stock record or location report at the time C & F conducted the 1997 and 1998 Audits of Sunpoint was not reasonable.[159]

166. Money market positions, including the Alliance Account, should have been included in "box counts" prepared by Sunpoint personnel.[160]

167. In light of all the evidence available to them, C & F's belief that the sweep money market positions were not under the control of Sunpoint was not reasonable at the time C & F conducted the 1997 and 1998 Audits of Sunpoint.

168. C & F's contention that its failure to understand Alliance was caused by Sunpoint's failure to include Alliance on stock records and location reports is neither credible nor supported by the evidence presented.

*The Regulation of Securities Broker–Dealers*

169. The SEC is the governmental entity tasked with the regulation and oversight of securities broker-dealers.[161]

170. Certain of the SEC's responsibilities for the regulation and oversight of securities broker-dealers are delegated by the SEC to the NASD. The NASD was the designated examining authority for Sunpoint at all times relevant to this Proceeding.[162]

171. The NASD conducted extensive periodic examinations, at least annually, at Sunpoint.[163]

172. The NASD examinations included a review of Sunpoint's compliance with the net capital, customer reserve, and possession and control rules.[164]

173. While routine periodic examinations administered to a broker-dealer may vary in scope, the initial examination administered upon changing from a non-clearing to clearing broker-dealer is comprehensive.[165]

174. The NASD conducted the initial examination of Sunpoint after it became a self-clearing broker-dealer in July, 1997. This examination was a comprehensive examination which included examination of Sunpoint's possession and control of securities, yet it erroneously did not include or detect Alliance.[166]

175. The NASD also conducted a routine examination in the summer of 1998, which included examination of Sunpoint's possession and control of securities, yet it erroneously did not include or detect Alliance.[167]

176. NASD was aware in 1997 of allegations raised by an arbitration panel that Lewis was "a bad apple" and that he constituted a threat to the integrity of the securities industry.[168]

---

158. *See* Trial Tr. vol. 8, 76.

159. *See* Trial Tr. vol. 6, 172–73; Trial Tr. vol. 7, 207–10, 221–26, 229–34, 242–44; Trial Tr. vol. 8, 245–54, 272–77; Trial Tr. vol. 11, 21–24.

160. Trial Tr. vol. 9, 103, 200.

161. Trial Tr. vol. 3, 31.

162. Trial Tr. vol. 9, 36, 85–86.

163. Trial Tr. vol. 9, 86–87.

164. Trial Tr. vol. 9, 87.

165. Trial Tr. vol. 9, 90–96.

166. Trial Tr. vol. 9, 114–15.

167. Trial Tr. vol. 9, 113–15.

168. Trial Tr. vol. 9, 143–50; Defendants' Exhibit 107.

177. The SEC and the NASD relied on C & F to provide them with full and adequate disclosures concerning the financial position of Sunpoint.[169]

178. The SEC and the NASD had full investigatory authority to review any and all representations made by Sunpoint or its auditors in relation to the business at Sunpoint.[170]

179. The NASD was aware, virtually simultaneously with C & F, of the net capital shortfall occasioned by Lewis' appropriation of Sunpoint assets, as well as the remedial steps taken on December 30 and 31, 1997.

180. The NASD was aware that the source of one of the capital infusions was Sunpoint Insurance, not Lewis himself.[171]

181. The NASD had its own concerns about the propriety of the capital infusions, and sent a representative to Sunpoint on January 8, 1998 to inquire about the capital infusions.[172]

182. The NASD determined on January 8, 1998, that it should examine the financial statements of Sunpoint Insurance, Inc., the bank records for the accounts affected by the transfers, which would include the records of the accounts from which the transfers were made, as well as the corporate minutes and corporate resolutions relating to the capital infusions.[173]

183. The NASD's virtually limitless access to relevant documents and records was more extensive than C & F's access, especially with respect to documents from entities with attenuated relation to Sun-

point, such as Sunpoint Insurance bank records.

184. It would have been easier for NASD to track the original source of the capital infusions in January, 1998 than it would have been for C & F.

185. C & F's ability to investigate the source of the infusion was limited by their restricted access to records originating outside Sunpoint, including records of Sunpoint Insurance and Mercantile Bank. The NASD faced no such limitation.

186. C & F sent a letter to Van Lewis on January 10, 1998, which stated the following:

Dear Van,

Based on the representations you have made to us regarding the cash infusion of $1,713,918.54, we would concur with recording the transaction as a reduction to the receivable from related party account with the excess increasing additional paid in capital.

Sincerely,

Jeffrey L. Cheshier, C.P.A.

Cheshier & Fuller, L.L.P.[174]

187. The representations contained in Cheshier's letter were provided with the intent and for the purpose of concurring with a particular accounting treatment, rather than providing informed assurance regarding the effect of the cash infusions on Sunpoint's compliance with regulatory requirements.

188. The Plaintiffs suggest that the NASD derived so much comfort and assurance from Cheshier's letter—a letter which explicitly stated that it was written in direct reliance on the representations of

169. Trial Tr. vol. 9, 41–45.

170. Trial Tr. vol. 9, 85–86.

171. Defendants' Exhibit 98.

172. Defendants' Exhibit 118. p. 2.

173. Defendants' Exhibits 98 and 100.

174. Plaintiffs' Exhibit 45.

Lewis—that it dropped all lines of inquiry and examination of source documentation and deemed the cash infusions proper, based solely upon the Cheshier letter. Based on the extreme concerns expressed, and voluminous information requested by the NASD before receiving Cheshier's letter, such an inference cannot credibly be drawn from the evidence.

189. The NASD was aware in February, 1998 of the fact that Lewis had demonstrated his ability during the last quarter of 1997 to withdraw and pledge broker-dealer capital at will.[175]

190. The NASD's knowledge regarding the source of the capital infusion did not immediately lead to any conclusion that the infusions were improper, or that the infusions did not sufficiently resolve the net capital deficiency at Sunpoint.

191. The SEC and the NASD would have required that Sunpoint cease operations as a clearing securities broker-dealer if they had concluded at the time of the 1997 Audit that a material amount of customer money was missing from Sunpoint's bank accounts.[176]

192. The SEC and the NASD would have required that Sunpoint cease operations as a clearing securities broker-dealer if they had concluded that the purported "capital infusion" in December 1997 came from Sunpoint customer funds.[177]

193. The SEC and the NASD would have required that Sunpoint cease operations as a clearing securities broker-dealer if they had concluded at the time of the 1998 Audit that more than $12 million which should have been invested in Alliance shares belonging to customers was missing.[178]

194. The NASD and the SEC were charged with the duty to notify SIPC if they became aware of facts which led them to believe that Sunpoint was in, or was approaching, financial difficulty such that customer assets were at risk.[179]

195. On November 23, 1998, the NASD received an anonymous tip suggesting that Sunpoint was misusing funds in its money market account.[180]

196. SIPC relied on the systemic requirement that full and adequate disclosures be made by C & F to the NASD and the SEC, and relied on NASD and the SEC to evaluate those disclosures.[181]

197. SIPC relied on the systemic requirement that the 1997 and 1998 Audit Reports contained all disclosures required to be made to the SEC and the NASD.[182]

198. SIPC neither viewed nor relied on the 1997 and 1998 Audit Reports themselves, but rather relied upon the discretion of the SEC and the NASD in their respective reviews of those reports.

199. SIPC did not rely on any representations of C & F.

*C & F's Negligence*

*The 1997 Audit*

200. C & F had a duty to perform the 1997 Audit as a reasonably prudent auditor would have done.

---

**175.** Defendants' Exhibit 103.

**176.** Trial Tr. vol. 9, 39–40, 57.

**177.** Trial Tr. vol. 8, 218; Trial Tr. vol. 9, 70–71.

**178.** Trial Tr. vol. 8, 255; Trial Tr. vol. 9, 68–69; Trial Tr. vol. 10, 287–88.

**179.** Trial Tr. vol. 9, 48–52.

**180.** Defendants' Exhibit 117.

**181.** Trial Tr. vol. 5, 12–13.

**182.** *Id.*

201. As of October 31, 1997, the Alliance account balance was in perfect balance with the Phase 3 records at Sunpoint.

202. By December 31, 1997, the aggregate value of the Alliance Fund shares held in the Alliance Account was $3,458,003.82 less than the value of the Alliance Fund shares that should have been in the Alliance Account and were reflected in the Phase 3 customer record maintained by Sunpoint.[183]

203. Bourland and Cheshier were the senior C & F personnel performing, directing and/or supervising the 1997 Audit.[184]

204. Lewis and the Lewis Affiliates benefitted from the misappropriation of assets from Sunpoint customers in substantial and material ways.[185]

205. Sunpoint benefitted incidentally from the misappropriation of assets from Sunpoint customers, but clearly Lewis' purpose in perpetuating the thefts was not to generate cash for Sunpoint's benefit, but rather to generate the cash necessary to fuel the engine of his theft, which was the entire conglomerate of affiliated entities.[186]

206. The misappropriation of assets from Sunpoint customers created a liability for Sunpoint to the Sunpoint customers in an amount in excess of the amount of the misappropriation.[187]

207. C & F reasonably should have known at the time it issued the 1997 Opinion that Sunpoint's Rule 17a–5 Internal Control Report did not adequately disclose various internal control weaknesses including the board resolution authorizing Lewis to divert company funds for personal use, as well as the lack of adequate internal control over the Alliance Account procedures.[188]

208. The presence of various factors identified in Statement of Auditing Standard 82 should have raised C & F's professional skepticism in their review of the December 30–31, 1997 capital infusions.[189]

209. When C & F issued the 1997 Opinion, C & F knew the following representations contained in the management representation letter were false:

(a) No events have occurred subsequent to the balance sheet date that would require consideration as adjustments to, or disclosures in, the financial statements;[190]

(b) There are no material weaknesses or inadequacies on October 31, 1997, or during the period November 1, 1996 to October 31, 1997, in the internal accounting controls and the procedures for safeguarding securities and the practices and procedures followed;[191]

(c) Net capital computations prepared by the company during the period from November 1, 1996 through December 16, 1997, indicated that the company was in compliance with the requirements of Rule 15c3–1 at all times during that period.[192]

---

183. Plaintiffs' Exhibit 234, p. 6.

184. Stipulated fact no. 19.

185. Trial Tr. vol. 2, 218–23.

186. Trial Tr. vol. 11, 77–80.

187. Trial Tr. vol. 11, 77–80.

188. Trial Tr. vol. 3, 184–87; Plaintiffs' Exhibit 27.

189. Trial Tr. vol. 3, 211–14.

190. Plaintiffs' Exhibit 2, ¶ 17.

191. Plaintiffs' Exhibit 24, ¶ 21.

192. Plaintiffs' Exhibit 24, ¶ 22; *see also* Trial Tr. vol. 3, 206–08; Trial Tr. vol. 5, 95–100.

210. C & F could not justifiably rely on any provisions of the management representation letters in 1997 because they knew that it contained misstatements. Knowing that multiple representations contained in that letter were false, C & F should have been skeptical of the propriety of relying on the other representations contained therein.

211. Although Sunpoint management misled C & F by failing to correct Cheshier's misapprehension of the nature of the Alliance Account, and by failing to include Alliance in the quarterly box counts, no acts or statements of any Sunpoint employee or representative prevented C & F from performing the 1997 Audit in accordance with GAAS.[193]

212. No acts or statements of any Sunpoint employee or representative prevented C & F from performing the 1997 Audit in accordance with accounting and auditing practices and standards required by the SEC.[194]

213. During the 1997 Audit, C & F failed to perform sufficient audit procedures on the Alliance Account.[195]

214. A reasonably prudent auditor would have performed adequate audit procedures on the Alliance Account during the 1997 Audit.[196]

215. During the 1997 Audit, C & F did not perform sufficient audit procedures with respect to the Deposits from Lewis and Sunpoint Insurance to adequately assess the propriety of treating the infusions as additional capital for purposes of complying with the net capital requirement established by SEC Rule 15c3–1.[197]

216. A reasonably prudent auditor, before issuing a letter opining on the propriety of a particular accounting treatment, would have performed audit procedures with respect to the Deposits from Lewis and Sunpoint Insurance sufficient to gain reasonable assurance of the propriety of treating the Deposits as additional capital for purposes of complying with the net capital requirement established by SEC Rule 15c3–1.[198]

217. Sunpoint's procedures with respect to the means by which money was moved into and out of the Alliance Account manifested an internal control weakness in its accounting system.[199]

218. Dieter had the responsibility to prepare the daily wire transfer, as well as the responsibility to reconcile the Alliance bank statement and the Phase 3 records. This constituted an internal control weakness, especially when considering the quantity of assets in the Alliance Account.[200]

219. C & F failed to perform the 1997 Audit in accordance with GAAS.[201]

220. A reasonably prudent auditor would have performed the 1997 Audit in

**193.** Trial Tr. vol. 3, 306; Trial Tr. vol. 7, 246, 249; Trial Tr. vol. 8, 211–14, 267–70, 288; Trial Tr. vol. 11, 66–69.

**194.** Trial Tr. vol. 3, 306; Trial Tr. vol. 7, 246.

**195.** Trial Tr. vol. 3, 247–48.

**196.** *Id.;* Trial Tr. vol. 10, 299; Trial Tr. vol. 11, 69–76.

**197.** Trial Tr. vol. 5, 110; Trial Tr. vol. 6, 150–51.

**198.** Trial Tr. vol. 5, 110; Trial Tr. vol. 11, 59–66.

**199.** *See* Trial Tr. vol. 3, 82–84.

**200.** *See* Trial Tr. vol. 3, 82–84.

**201.** Trial Tr. vol. 3, 210; Trial Tr. vol. 11, 80–84.

accordance with GAAS.[202]

221. C & F failed to perform the 1997 Audit in accordance with accounting and auditing practices and standards required by the SEC.[203]

222. A reasonably prudent auditor would have performed the 1997 Audit in accordance with accounting and auditing practices and standards required by the SEC.[204]

223. C & F failed to perform the 1997 Audit as a reasonably prudent auditor.[205]

224. However, if C & F had properly understood Sunpoint's relationship with the Alliance Account in 1997, its audit procedures would have still shown the Alliance Account to have been in balance with Sunpoint's Phase 3 records as of October 31, 1997, indicating that, at the end of the relevant audit period, customer funds were not missing from the Alliance Account.[206]

225. Van Lewis began stealing customer funds from Alliance sometime in early November 1997.

226. The thefts by Lewis from the Alliance Account began before C & F began their audit procedures in November 1997.

227. C & F's failures regarding the Alliance Account in its 1997 Audit did not induce Lewis' initial theft. The initial thefts predated C & F's failures, but postdated C & F's audit responsibility in 1997.

228. However, theft of assets for which Sunpoint was responsible was a foreseeable consequence of C & F's failure to properly conduct its audits.

229. There is insufficient evidence to support a finding that, if C & F had disclosed in the 1997 17a–5 Internal Control Report Sunpoint's lack of adequate internal control procedures with respect to the Alliance Account, the response from any party including the NASD, the SEC, or SIPC would have precluded Lewis and his coconspirators from continuing to perpetuate the theft.[207]

230. C & F's failure to perform adequate tests and procedures on the Alliance Account during the 1997 Audit was not a cause of damages to SIPC, Sunpoint, or the customers of Sunpoint.

231. C & F acted properly in confirming that the NASD was aware of the events that occurred on December 29–31, 1997, which precipitated the cash infusion into Sunpoint by Lewis.

232. The failure to sufficiently investigate the source of the capital infusions rests with the NASD, given its suspicions with respect to the infusions and its documented history with Lewis and Sunpoint.

233. C & F's failure to investigate the source of Lewis' cash infusions did not proximately cause the damages to Sunpoint and its customers.

234. C & F's misrepresentation of the proper accounting treatment of the infusions did not proximately cause the damages to Sunpoint and its customers.

235. There is insufficient evidence to support a finding that C & F's failure to adequately discover and disclose the entire universe of related-party transactions in

---

202. Trial Tr. vol. 3, 210; Trial Tr. vol. 5, 129.

203. Trial Tr. vol. 3, 287–88; Trial Tr. vol. 11, 80–84.

204. Trial Tr. vol. 3, 287–88; Trial Tr. vol. 4, 22–23.

205. Trial Tr. vol. 3, 247; Trial Tr. vol. 4, 22–23; Trial Tr. vol. 11, 80–84.

206. Plaintiffs' Exhibit 234, p. 5.

207. *See* Defendants' Exhibit 103.

the 1997 Audit proximately caused damages to Sunpoint and its customers.

236. There is insufficient evidence to support a finding that C & F intended to deceive customers by truncating the opinion included in Sunpoint's statement of financial condition mailed by Sunpoint to Sunpoint customers in 1997. Any deficiency in the scope of such statement reflects only Sunpoint's own failure to comply with statutory requirements.

237. C & F breached its duty of care to Sunpoint.[208]

238. C & F negligently performed the 1997 Audit of Sunpoint.[209]

239. Cheshier was directly involved in the specific activity constituting errors, omissions, negligence, or malfeasance of C & F in the 1997 Audit.[210]

240. Cheshier was directly involved in the negligent performance of the 1997 Audit.[211]

241. Cheshier's failure to perform an adequate audit reflects a lack of experience in conducting the audit of a clearing broker-dealer and a lack of professional judgment in electing to lead the audit team despite his lack of experience.

*The 1998 Audit*

242. C & F had a duty to perform the 1998 Audit as a reasonably prudent auditor would have done.

243. By November 19, 1998 (the date C & F completed its field work for the 1998 Audit), the aggregate value of the Alliance Fund shares held in the Alliance Account was $12,150,037.92 less than the value of the Alliance Fund shares that should have been in the Alliance Account and were reflected in the Phase 3 customer record maintained by Sunpoint.[212]

244. After November 19, 1998, an additional $13,224,914.27 was misappropriated from the Alliance Account.[213]

245. Bourland and Cheshier were the senior C & F personnel performing, directing and/or supervising the 1998 Audit.[214]

246. The presence of various factors identified in Statement of Auditing Standard 82 should have raised C & F's professional skepticism in their review of the December 30–31, 1997 capital infusions.[215]

247. C & F reasonably should have known at the time it issued the 1998 Opinion that Sunpoint's financial statements contained material misstatements.[216]

248. C & F reasonably should have known at the time it issued the 1998 Opinion that at least $12 million in customer funds that should have been invested in the Alliance Account was missing as of October 31, 1998.[217]

249. C & F reasonably should have known at the time it issued the 1998 Opinion that Sunpoint's financial statements as of October 31, 1998 did not fairly present the financial position of Sunpoint.[218]

---

208. Trial Tr. vol. 5, 129–30.

209. *Id.*

210. Trial Tr. vol. 3, 135–36; Trial Tr. vol. 6, 40–41.

211. Trial Tr. vol. 3, 135–36; Trial Tr. vol. 6, 40–41.

212. *Id.* at 10.

213. *Id.*

214. Stipulated fact no. 19.

215. Trial Tr. vol. 3, 211–14.

216. Trial Tr. vol. 3, 208–10, 301, 304.

217. Trial Tr. vol. 3, 208–10.

218. Trial Tr. vol. 3, 301, 304.

250. When C & F issued the 1998 Opinion, C & F knew at least the following material statement contained in the 1998 management representation letter was false: "There have been no communication from regulatory agencies concerning non-compliance with, or deficiencies in, financial reporting practices." [219]

251. When C & F issued the 1998 Opinion, C & F should have known the 1998 management representation contained material misrepresentations, including the following:

(a) There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements; [220]

(b) There [has] been no fraud involving management or employees who have significant roles in internal control; [221]

(c) [Related party transactions] have been properly recorded or disclosed in the financial statements; [222]

(d) The Company has complied with all aspects of contractual agreements that would have an effect on the financial statements in the event of noncompliance. [223]

252. C & F could not justifiably rely on any provisions of the management representation letter in 1998 because they knew that it contained misstatements. Knowing that several representations contained in that letter were false, C & F should have been skeptical of the propriety of relying on the other representations contained therein.

253. When C & F issued the 1998 Opinion, C & F reasonably should have known that the financial statements referred to in the management representation letter contained material misstatements. [224]

254. Although Sunpoint management misled C & F by failing to disclose Sunpoint's liability for stolen customer funds, failing to correct Cheshier's misapprehension of the nature of the Alliance Account, and failing to include Alliance in the quarterly box counts, no acts or statements of any Sunpoint employee or representative prevented C & F from performing the 1998 Audit in accordance with GAAS. [225]

255. No acts or statements of any Sunpoint employee or representative prevented C & F from performing the 1998 Audit in accordance with accounting and auditing practices and standards required by the SEC. [226]

256. During the 1998 Audit, C & F failed to recognize and disclose a shortage in customer assets as of the 1998 Audit date. [227]

257. A reasonably prudent auditor would have recognized and disclosed a shortage in customer assets as of the 1998 Audit date. [228]

258. During the 1998 Audit, C & F failed to perform adequate audit procedures on the Alliance Account. [229]

219. Trial Tr. vol. 5, 100–01; Plaintiffs' Exhibit 25.

220. Plaintiffs' Exhibit 25, ¶ 4.

221. Plaintiffs' Exhibit 25, ¶ 5.

222. Plaintiffs' Exhibit 25, ¶ 7.

223. Plaintiffs' Exhibit 25, ¶ 18.

224. Trial Tr. vol. 5, 100–01; Plaintiffs' Exhibit 25.

225. Trial Tr. vol. 3, 306; Trial Tr. vol. 7, 246.

226. Trial Tr. vol. 3, 306; Trial Tr. vol. 7, 246.

227. Trial Tr. vol. 3, 301.

228. *Id.*

229. Trial Tr. vol. 3, 287–88; Trial Tr. vol. 7, 278–80.

259. Sunpoint's procedures with respect to the means by which money was moved into and out of the Alliance Account manifested an internal control weakness in its accounting system.[230]

260. A reasonably prudent auditor would have performed adequate audit procedures on the Alliance Account during the 1998 Audit.[231]

261. The cash infusions were relevant to both the 1997 and 1998 Audits because, though they were necessary to resolve a problem identified in fiscal year 1997, their occurrence as an accounting event pertained to fiscal year 1998.

262. During the 1998 Audit, C & F failed to perform sufficient audit procedures with respect to the Deposits from Lewis and Sunpoint Insurance to adequately assess the propriety of treating the infusions as additional capital for purposes of complying with the net capital requirement established by SEC Rule 15c3-1.[232]

263. A reasonably prudent auditor would have performed audit procedures with respect to the Deposits from Lewis and Sunpoint Insurance sufficient to gain reasonable assurance of the propriety of treating the Deposits as additional capital for purposes of complying with the net capital requirement established by SEC Rule 15c3-1.[233]

264. C & F failed to perform the 1998 Audit in accordance with GAAS.[234]

265. A reasonably prudent auditor would have performed the 1998 Audit in accordance with GAAS.[235]

266. C & F failed to perform the 1998 Audit in accordance with accounting and auditing practices and standards required by the SEC.[236]

267. A reasonably prudent auditor would have performed the 1998 Audit in accordance with accounting and auditing practices and standards required by the SEC.[237]

268. C & F failed to perform the 1998 Audit as a reasonably prudent auditor.[238]

269. C & F's failure to perform adequate tests and procedures on the Alliance Account during the 1998 Audit was a proximate cause of damages to Sunpoint and its customers.[239]

270. There is insufficient evidence to support a finding that C & F's failure to adequately discover and disclose the entire universe of related-party transactions in the 1998 Audits proximately caused damages to Sunpoint and its customers.

271. There is insufficient evidence to support a finding that C & F intended to deceive customers by truncating the opinion included in Sunpoint's statement of financial condition mailed by Sunpoint to Sunpoint customers in 1998. Any deficien-

---

230. *See* Trial Tr. vol. 3, 82–84.

231. Trial Tr. vol. 3, 287–88; Trial Tr. vol. 11, 69–75.

232. Trial Tr. vol. 3, 175; Trial Tr. vol. 7, 259, 273.

233. Trial Tr. vol. 3, 174, 191–92; Trial Tr. vol. 11, 48–53, 59–66.

234. Trial Tr. vol. 3, 292–93; Trial Tr. vol. 11, 80–84.

235. Trial Tr. vol. 3, 287–88.

236. Trial Tr. vol. 3, 268; Trial Tr. vol. 11, 80–84.

237. Trial Tr. vol. 3, 80.

238. Trial Tr. vol. 3, 247; Trial Tr. vol. 11, 80–84.

239. Trial Tr. vol. 3, 284; Trial Tr. vol. 4, 22; Trial Tr. vol. 8, 255.

cies in the scope of such statement reflect only Sunpoint's own failure to comply with statutory requirements.

272. C & F breached its duty of care to Sunpoint.[240]

273. C & F negligently performed the 1998 Audit of Sunpoint.[241]

274. C & F's breaches of its duty of care to Sunpoint with respect to the 1998 Audit were a proximate cause of damages to Sunpoint in its role as the bailee of customer property.[242]

275. C & F's negligent performance of the 1998 Audit proximately caused damages to Sunpoint.[243]

276. Cheshier was directly involved in the specific activity constituting errors, omissions, negligence, or malfeasance of C & F in the 1998 Audit.[244]

277. Cheshier was directly involved in the negligent performance of the 1998 Audit.[245]

278. Cheshier's failure to perform an adequate audit reflects a lack of experience in conducting the audit of a clearing broker-dealer and a lack of professional judgment in electing to lead the audit team despite his lack of experience.

*Negligent Misrepresentation*

279. C & F made material misrepresentations to Sunpoint, the customers of Sunpoint, the NASD, and the SEC.[246]

280. C & F's material misrepresentations were made to Sunpoint, the customers of Sunpoint, the NASD, and the SEC in the course of the 1997 and 1998 Audit.[247]

281. C & F supplied false information to Sunpoint, the customers of Sunpoint, the NASD, and the SEC in the course of the 1997 Audit.[248]

282. C & F supplied false information to Sunpoint, the customers of Sunpoint, the NASD, and the SEC in the course of the 1998 Audit.[249]

283. C & F did not exercise reasonable care or competence in obtaining or communicating information to Sunpoint, the customers of Sunpoint, the NASD, and the SEC in the course of the 1997 Audit.[250]

284. C & F did not exercise reasonable care or competence in obtaining or communicating information to Sunpoint, the customers of Sunpoint, the NASD, and the SEC in the course of the 1998 Audit.

285. The evidence is insufficient to support a finding that the customers of Sunpoint relied on the false information supplied by, and the material misrepresentations made by C & F.[251]

286. Everett Bassinger, a customer of Sunpoint, did not rely on the financial information provided to him by Sunpoint.

240. Trial Tr. vol. 5, 129–30.

241. *Id.*

242. Trial Tr. vol. 8, 218, 255; Trial Tr. vol. 9, 68–71.

243. Trial Tr. vol. 8, 218, 255,; Trial Tr. vol. 9, 68–71.

244. Trial Tr. vol. 3, 135–36; Trial Tr. vol. 6, 40–41.

245. Trial Tr. vol. 4, 17–19; Trial Tr. vol. 6, 40–41.

246. Trial Tr. vol. 5, 129–30.

247. Trial Tr. vol. 5, 129–30; Plaintiffs' Exhibits 29 and 30.

248. Trial Tr. vol. 5, 129–30; Plaintiffs' Exhibits 29 and 30.

249. Trial Tr. vol. 3, 304–05; Plaintiffs' Exhibits 29 and 30.

250. Trial Tr. vol. 5, 129–30.

251. Trial Tr. vol. 4, 232–33; Trial Tr. vol. 10, 12–13.

287. Bassinger's testimony regarding reliance was not credible given his sworn assertion that if the financial statements had indicated substantial concerns about whether Sunpoint could remain in business, he would have removed his money. The 1997 statements provided to customers did contain such a statement, so Mr. Bassinger's failure to close his Sunpoint account upon receiving the going-concern notification belies any asserted claim of reliance.[252]

288. Harold Deteau, another customer of Sunpoint, did not rely on the financial information provided to him by Sunpoint.

289. Deteau's testimony regarding his reliance was not credible due to his admission that he actually relied on his personal relationship with Marvin Sapaugh and utilized Sapaugh to answer any questions he might have regarding Sunpoint.[253]

290. SIPC never received nor reviewed the misrepresentations of C & F, and therefore did not rely thereon.

*Damages*

291. The Trustee asserted legal claims against former directors Hagen, Sapaugh, and Pope, alleging that the three were liable for at least a portion of the $25 million constituting the damages alleged in this case. An insurer settled those claims on their behalf for $450,000.[254]

292. David Hayslip was a member of management at Sunpoint. The Trustee alleged in a separate proceeding that Hayslip was aware of Lewis' theft and should be held liable for the entire $25 million. Hayslip entered a settlement agreement in that action with the Trustee.[255]

293. Judy Guess was Van Lewis' girlfriend. The Trustee alleged in a separate proceeding against Guess that she was aware of Lewis' theft and should be held liable for the entire $25 million. Guess entered a settlement agreement in that action with the Trustee.[256]

294. Harold R. Fuller was a partner at C & F who passed away after the commencement of this case. Stanley Seat, acting as the successor independent executor of the decedent's estate of Mr. Fuller, subsequently reached a settlement agreement with the Trustee regarding the potential liability of that decedent's estate.[257]

295. Sunpoint bears some responsibility for the loss because it failed to engage an adequate system of corporate governance, including employment of a diverse board of directors, to prevent thefts such as the one that Lewis perpetrated.

296. Defendants pled the existence of other parties, including those mentioned above, who should bear responsibility for the loss complained of by the Plaintiffs.[258]

297. Defendants did not properly identify or designate the NASD or SEC as a responsible third party to whom a portion of the responsibility for Sunpoint and its customers' losses could be attributed.

---

**252.** Trial Tr. vol. 10, 12–15; Plaintiffs' Exhibit 632.

**253.** Trial Tr. vol. 4, 237–38.

**254.** Trial Tr. vol. 1, 234–35.

**255.** *See* Plaintiffs' Exhibits 1 and 2; Trial Tr. vol. 1, 242.

**256.** Trial Tr. vol. 1, 245–48.

**257.** See *Order Granting Trustee's Motion for Order Under Bankruptcy Rule 9019 Authorizing Compromise of Controversy as to Stanley Seat, Executor of the Estate of Harold R. Fuller* entered in the underlying SIPA liquidation proceeding, cause no. 99–6073, on November 3, 2003 (dkt. no. 489).

**258.** *See Amended Answer* filed on October 19, 2001 (dkt. # 55) at p. 14.

298. Hagen, Sapaugh, Pope, Hayslip, Guess, and Stanley Seat, solely as the successor independent executor of the estate of Harold R. Fuller, Deceased, are all settling persons as that term is defined in TEX. CIV. PRAC. & REM.CODE ANN. § 33.011(5).[259]

299. The Trustee's actual damages for which C & F's negligence was a proximate cause total $13,224,914.27.[260]

300. To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

### Conclusions of Law

*Jurisdiction and Venue*

1. This Court has jurisdiction over this Proceeding pursuant to Section 78eee(b)(4) of the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"). This Proceeding is a non-core proceeding.

2. Venue in this Court is proper and founded upon 28 U.S.C. § 1409 in that this Proceeding arises in or is related to the Sunpoint Securities, Inc. liquidation proceeding, Adversary No. 99–6073, initiated by an application for a protective decree filed by SIPC in the Eastern District of Texas pursuant to 15 U.S.C. § 78eee(b)(1).

*Standing*

3. SIPC has the standing and power to bring this action on its own behalf pursuant to 15 U.S.C. § 78ccc(b)(1).

4. Pursuant to 15 U.S.C. § 78fff–3(a), SIPC has standing to assert the claims in this Proceeding as subrogee to the claims of Sunpoint customers whose net equity claims, as defined in 15 U.S.C. § 78*lll* (11), have been paid from moneys advanced to the Trustee by SIPC.

5. Pursuant to 15 U.S.C. § 78fff–1(a), the Trustee has standing and power to assert the claims in this Proceeding on behalf of the estate of Sunpoint.

6. The Trustee is the representative of the estate of Sunpoint. He has the powers available to a trustee pursuant to SIPA. 15 U.S.C. § 78aaa et seq.

7. As bailee of property of Sunpoint customers, the Trustee has standing to bring any actions which could have been brought by bailors, the customers of Sunpoint. *Redington v. Touche Ross & Co.*, 592 F.2d 617, 625 (2nd Cir.1978), rev'd on other grounds, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

8. The Trustee has standing to assert the claims in this Proceeding as bailee of the customers of Sunpoint. *Id.*

*Miscellaneous*

9. Pursuant to 15 U.S.C. § 78eee(a)(1), the NASD and the SEC were required to notify SIPC if they became aware of facts which led them to believe that Sunpoint was in or was approaching financial difficulty.

10. It was appropriate to allow the Plaintiffs to present evidence of the reliance by Sunpoint customers upon the statements made by C & F by presenting testimony of representative customers. The utilization of representative customers eliminated any need for an endless parade of customers to be brought to trial merely

---

**259.** The Defendants asserted that CNB should also be apportioned responsibility in this action. However, CNB had not settled its action with the Trustee at the time this cause of action was submitted to the Court. Additionally, the Defendants asserted that various entities against whom the Trustee has not sought recovery, including Carmela Davis, Mary Powers, Stacy Meador, and the NASD should each bear a portion of the responsibility for Sunpoint's losses. However, they were not properly joined or identified as responsible third parties under TEX. CIV. PRAC & REM.CODE § 33.004.

**260.** Plaintiffs' Exhibit 234.

for the purpose of testifying to the extent of their individual reliance upon Sunpoint monthly statements.

11. The inference created by the testimony of the representative customers could be weighed positively or negatively. To the extent that the testimony of the representative customers failed to establish reliance, the Plaintiffs would be bound by such evidence.

12. The risk of selecting appropriate representative customers rested solely upon the Plaintiffs.

*Statute of Limitations*

13. Generally, a claim for negligent misrepresentation under Texas law is subject to a two-year statute of limitations under Tex. Civ. Prac. & Rem.Code § 16.003(a). *Provident Life and Acc. Ins. Co. v. Knott,* 128 S.W.3d 211, 221 n. 9 (Tex.2003), *citing HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 885 (Tex.1998); *Texas Soil Recycling, Inc. v. Intercargo Ins. Co.,* 273 F.3d 644, 649 (5th Cir.2001).

14. For a suit to be timely under § 16.003(a), it must be brought within two years following the date the cause of action accrues. *Askanase v. Fatjo,* 828 F.Supp. 465, 470 (S.D.Tex.1993).

15. The Supreme Court of Texas has held that a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *See S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex. 1996). Accordingly, occurred. *See S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex.1996). Accordingly, when the elements of duty, breach, and resulting injury are present, a tort action accrues. *See Burke v. Ins. Auto Auctions Corp.,* 169 S.W.3d 771, 776 (Tex. App.-Dallas 2005, no pet.).

16. A question arises as to whether the "discovery rule" applies in the determination of when a cause of action for negligent misrepresentation accrues. The Fifth Circuit in a 1994 decision, *Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp.,* 20 F.3d 1362, 1371–72 (5th Cir.1994), answered that question in the negative. ["We hold that the discovery rule is not applicable to negligent misrepresentation claims under Texas law and apply the general rules of accrual for negligence causes of action."]; *TIG Ins. Co. v. Aon Re, Inc.,* No. Civ. A. 3:04CV1307–B, 2005 WL 3742818, at *8 (N.D.Tex. Nov.7, 2005), *Hunton v. Guardian Life Ins. Co.,* 243 F.Supp.2d 686, 703 (S.D.Tex.2002).

17. Yet the Circuit has twice acknowledged that the Kansa prediction may no longer be accurate. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 570 (5th Cir.2003) ["It is unclear whether the discovery rule tolls the Texas statute of limitations for negligent misrepresentation claims."]; *Ptasynski v. Shell Western E & P Inc.,* No. 99–11049, 2002 WL 32881277, at *3–4 (5th Cir. Feb. 13, 2002) ["It is uncertain whether Texas's discovery rule applies to negligent misrepresentation claims."].

18. Indeed, without literally acknowledging it, the Texas Supreme Court engaged in a discovery rule analysis on a negligent misrepresentation claim in *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886 (Tex.1998), and several Texas intermediate appellate courts have expressly applied the discovery rule to negligent misrepresentation claims. *See, e.g., Sabine Towing & Transp. Co. v. Holliday Ins. Agency, Inc.,* 54 S.W.3d 57, 60–61 (Tex. App.-Texarkana 2001, pet denied); *Matthiessen v. Schaefer,* 27 S.W.3d 25, 31 (Tex. App.-San Antonio 2000, pet. denied); *Hendricks v. Thornton,* 973 S.W.2d 348, 365 (Tex.App.-Beaumont 1998, pet. denied).

19. Thus, the Court concludes that the Texas legal landscape has significantly changed in this regard since the *Kansa* decision in 1994 and that Texas law would now apply the discovery rule in negligent misrepresentation cases.

20. Under the discovery rule, a cause of action does not accrue until the claimant discovers or, in the exercise of reasonable diligence, should have discovered the facts establishing the elements of his cause of action. This exception "applies in cases ... in which the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Murphy*, 964 S.W.2d at 270, citing *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex.1996) (internal quotations omitted). "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.*

21. The Court finds that the injury to the customers of Sunpoint arising from the allegedly negligent misrepresentations contained in the C & F's two audit reports was inherently undiscoverable by such customers until the theft of the customer funds was uncovered on or about November 19, 1999. It is highly unlikely, and unrealistic to believe, that a customer of Sunpoint, as a lay person, could have perceived and acted upon the inaccuracy of the representations contained in the Defendants' audit reports merely by reviewing the contents of those reports.

22. Further, the alleged injury arising from such misrepresentations is objectively verifiable. If taken as true, such misrepresentations by C & F in their audit reports allowed Lewis to misappropriate more than $25 million of customer funds and caused the closure of Sunpoint as an ongoing enterprise. Thus, the Court concludes that the cause of action for negli-

gent misrepresentation asserted by SIPC as subrogee of the customers against these Defendants did not accrue until November, 1999.

23. In order to raise the discovery rule in federal court, a plaintiff need not expressly plead the rule. It is sufficient for a plaintiff to plead sufficient facts to put the defense on notice of the theories upon which the complaint is based. *Simpson v. James*, 903 F.2d 372, 375 (5th Cir.1990). The allegations contained in the series of complaints filed by the SIPC in this action clearly meet that federal pleading standard and are sufficient to trigger the application of the discovery rule to the applicable limitation period for negligent misrepresentation.

24. The cause of action possessed by the customers of Sunpoint, and now alleged by the SIPC, for the allegedly negligent misrepresentations made by C & F in each of its audit years, 1997 and 1998, did not accrue, pursuant to the discovery rule, until November 19, 1999, the date that the protective decree was entered on behalf of Sunpoint.

25. The two-year statute of limitations within which to bring a cause of action for such negligent misrepresentations did not run until about November 19, 2001. The complaint was filed against the Defendants on September 1, 2000 and, therefore, the SIPC's claims for negligent misrepresentation in each of the respective audit years are not barred by the applicable statute of limitations.

26. Generally, a claim for professional negligence under Texas law is subject to a two-year statute of limitations under TEX. CIV. PRAC. & REM.CODE § 16.003(a) which governs causes of action premised upon the professional negligence of either attorneys or accountants. *Mur-*

*phy v. Campbell,* 964 S.W.2d 265, 270 (Tex. 1997).

■ 27. For a suit to be timely under § 16.003(a), it must be brought within two years following the date the cause of action accrues. *Askanase v. Fatjo,* 828 F.Supp. 465, 470 (S.D.Tex.1993).

■ 28. At the earliest, the two-year statute of limitations for malpractice relating to the Defendants' 1997 Audit accrued to Sunpoint on December 16, 1997. Thus, absent other applicable law, the limitations period would have expired in December, 1999.

29. However, pursuant to the provisions of 15 U.S.C. § 78fff(b),[261] the Trustee is also entitled to rely upon the statutory tolling of limitations provided by 11 U.S.C. § 108(a)(2). *Quilling v. Compass Bank,* 2004 WL 2093117 at *5 (N.D.Tex., Sept. 17, 2004); *Mishkin v. Ageloff,* 1998 WL 651065 at *5 (S.D.N.Y., Sept. 23, 1998) [both finding that a SIPA liquidation trustee may use the time extension provisions of § 108 of the Bankruptcy Code].

30. 11 U.S.C. § 108(a) provides, in relevant part, that:

> If applicable nonbankruptcy law ... fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

31. The two-year statute of limitations for malpractice relating to the 1997 Audit had not expired as of November 19, 1999, the date that the protective decree was entered on behalf of Sunpoint.

32. Section 108(a) extended that limitation period for the Trustee's claim against the Defendants for professional malpractice for a period of two years—to November 19, 2001. The complaint was filed against the Defendants on September 1, 2000 and, therefore, the Trustee's claim for professional malpractice relating to the 1997 Audit is not barred by the applicable statute of limitations.

■ 33. The two-year statute of limitations for malpractice relating to the Defendants' 1998 Audit accrued to Sunpoint on January 21, 1999. Thus, absent other applicable law, the limitations period would have expired in January, 2001.

34. Since the Trustee's complaint was filed against the Defendants on September 1, 2000, prior to the expiration of the 2–year statute, the Trustee's claim for professional malpractice relating to the 1998 Audit is not barred by the applicable statute of limitations without any necessity to invoke 11 U.S.C. § 108.

*Proximate and Superseding Cause*

■ 35. "Proximate cause includes two essential elements: (1) foreseeability, and (2) cause in fact...." *F.D.I.C. v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992) (citing *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980)). *See generally, IHS Cedars Treatment Center*

---

**261.** 15 U.S.C. § 78fff(b) provides that:
To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11. For the purposes of applying such title in carrying out this section, a reference in such title to the date of the filing of the petition shall be deemed a reference to the filing date under this chapter.

*v. Mason,* 143 S.W.3d 794, 798–99 (Tex. 2004).

■ 36. Negligent acts are only a *cause in fact* of harm if they are a substantial factor in bringing about the harm, without which no harm would have occurred. *Id.*

■ 37. Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995).

■ 38. As for superseding cause, Texas courts have adopted the definition derived from the Restatement (Second) of Torts: "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." RESTATEMENT (SECOND) OF TORTS § 440 (1965); *Hall v. Huff,* 957 S.W.2d 90, 97 n. 23 (Tex.App.-Texarkana 1997, pet. denied).[262]

■ 39. Texas courts evaluate the following six factors in deciding whether an intervening cause of damages supersedes a defendant's action such that liability should be shifted entirely away from a defendant:

(a) whether the intervening action brings about harm different in kind from that which otherwise would have resulted from the actor's negligence;

(b) whether the intervening action or its consequences appear to be extraordinary rather than normal;

(c) whether the intervening force acted independently of any situation created by the actor's negligence or is not a normal result of such negligence;

(d) whether the intervening force is due to a third person's act or failure to act;

(e) whether the intervening force is due to the act of a third person that is wrongful to the plaintiff and potentially subjects the third person to liability to the plaintiff; and

(f) the degree of culpability of the wrongful act of the third person that sets in motion the intervening force.

*Phan Son Van v. Pena,* 990 S.W.2d 751, 754 (Tex.1999), citing *Humble Oil & Ref. Co. v. Whitten,* 427 S.W.2d 313, 315 (Tex. 1968).

40. The parties have not cited, nor has the Court located, any case law applying the above-listed factors to a case involving negligence by an auditor or determining whether the fraud of an audit client's management constitutes a superseding cause.

41. The *Whitten* factors, while helpful in other cited contexts, are not precisely situated to enlighten the analysis in this context.

■ 42. In considering the first three *Whitten* factors, the Court finds that:

(a) [*regarding whether the intervening action brings about harm different in kind from that which otherwise would have resulted from the actor's negligence*] client liability for missing assets is the harm that results from either audit failure or management fraud;

(b) [*whether the intervening action or its consequences appear to be extraordinary rather than normal*] if management fraud were an extraordinary occurrence in the scheme of our corporate system, and the securities industry in particular, auditors would not be

---

**262.** Some Texas courts use the term "new and independent cause," in lieu of superseding cause. *See, e.g., Morris v. JTM Materials,* *Inc.,* 78 S.W.3d 28 (Tex.App.-Fort Worth 2002, no pet.).

charged with the responsibility to detect it;

(c) [*whether the intervening force acted independently of any situation created by the actor's negligence or is not a normal result of such negligence*] although Lewis and Wilder did not collude or conspire with C & F, C & F's negligence certainly enabled Lewis and Wilder to avoid detection as they manipulated the Alliance Account, and it would be a misstatement to suggest that the two causes were completely independent of one another.

43. These first three factors indicate that the acts of Lewis and Wilder did not constitute a superseding cause of the Plaintiffs' loss.

44. However, the remaining three *Whitten* factors:

(d) whether the intervening force is due to a third person's act or failure to act;

(e) whether the intervening force is due to the act of a third person that is wrongful to the plaintiff and potentially subjects the third person to liability to the plaintiff; and

(f) the degree of culpability of the wrongful act of the third person that sets in motion the intervening force.

weigh in favor of a finding that Lewis and Wilder's acts constitute a superseding cause (i.e., Lewis and Wilder are extremely culpable third-party actors who would be liable to Sunpoint for their wrongdoing).

 45. However, under Texas law, "to be a superseding cause, the intervening force must not be ordinarily or reasonably foreseeable." *Pena,* 990 S.W.2d at 754; *Spears v. Coffee,* 153 S.W.3d 103 (Tex. App.-San Antonio 2004, no pet.). See also RESTATEMENT (SECOND) OF TORTS § 448 (1965).[263]

46. The idea that fraud by a company's management is not reasonably foreseeable to an auditor is, of course, preposterous. Auditors are hired to provide reasonable assurance that a client's financial statements are free from material misstatement, whether occasioned by error or fraud. *See SAS 82.*

47. In addition to the foreseeability analysis endorsed in *Pena* and as a general observation, finding fraud by management to be a superseding cause of harm for which an auditor's negligence would otherwise be a proximate cause would undermine the very purpose for which auditors are hired.

 48. While it is possible that an audit will fail to detect fraud despite an auditor's best and adequate efforts, where an auditor has negligently failed to perform his duties as a reasonably prudent auditor would, that auditor should not escape liability for the harm which his negligence proximately caused merely because a condition he was hired to detect was actually present (and went undetected).

 49. As Texas law recognizes: In determining proximate cause, courts distinguish between a new and independent cause and a concurrent act; while a concurrent act cooperates with the origi-

---

**263.** Section 448 provides that:

The act of a third person in committing an intentional tort or crime *is a superseding cause* of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor at the* *time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.*

RESTATEMENT (SECOND) OF TORTS § 448 (1965) (emphasis added).

nal act in bringing about the injury and does not cut off the liability of the original actor, a new and independent cause is an act or omission of a *separate and independent agency that destroys the causal connection* between the negligent act or omission of the Defendant, and the injury complained of, and thereby becomes the immediate cause of such injury. *An intervening cause that is reasonably foreseeable by the defendant, though, is not a new and independent cause that breaks the chain of causation.*

*James v. Kloos*, 75 S.W.3d 153, 161 (Tex. App.-Fort Worth 2002, no pet.) (emphasis added).

50. In lieu of providing protection for negligent defendants, it is proper to evaluate Lewis and Wilder's fraudulent conduct, not as a superseding cause, but as factors which bear on the proportionate responsibility of each defendant. In fact, proportionate responsibility is precisely situated to address the inequities highlighted by the application of the last three *Whitten* factors.

51. Therefore, the wrongful acts of Lewis and Wilder did not constitute a superseding cause of damage which relieves C & F from liability in this context.

*Professional Negligence (Malpractice)*

52. The Trustee, as successor-in-interest to the claims belonging to Sunpoint, may pursue a professional negligence claim against C & F under Texas law only under a negligence cause of action. *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 198 (Tex.App.Houston [14th Dist.] 2002, pet. denied) ["If the gist of a client's complaint is that the [professional] did not exercise that degree of care, skill, or diligence as [professionals] of ordinary skill and knowledge commonly possess, then that complaint should be pursued as a negligence claim, rather than some other claim."].

53. Whether the Trustee labels his action one for malpractice, breach of contract, negligence, or negligent misrepresentation, it is still only a tort action sounding in negligence under Texas law.

54. Recovery on a theory of negligence requires a showing that the defendant owed the plaintiff a duty to avoid negligent action, and that the defendant breached that duty, proximately causing damages to the plaintiff. *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex.1989).

55. C & F owed a duty to Sunpoint to exercise that degree of care, skill and diligence exercised by reasonably prudent certified public accountants and auditors under the same or similar circumstances. *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 185 (Tex.App.Waco 1987, writ denied).

56. Other jurisdictions have held that only a client may recover from an auditor under a negligence theory, applying the traditional stricture of privity. In other words, such jurisdictions would state that auditors do not owe a duty to noncontracting third parties to exercise their profession with the requisite skill, thoroughness, and expertise. *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 406, 11 Cal. Rptr.2d 51, 834 P.2d 745, 767 (Cal. 1992)["[W]e hold that an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client, i.e., the person who contracts for or engages the audit services. Other persons may not recover on a pure negligence theory."].

57. The Court is not aware of any Texas case adopting this position in the context of auditor negligence, but the Supreme Court of Texas has adopted that strict privity approach in holding that only

clients may recover from attorneys on a negligence theory. *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.,* 192 S.W.3d 780, 782–83 (Tex.2006) [noting that legal malpractice claims sound in tort, and stating, "While an attorney always owes a duty of care to a client, no such duty is owed to non-client beneficiaries, even if they are damaged by the attorney's malpractice."].

58. This Court must make an *Erie* guess as to whether the Supreme Court of Texas would find that auditors owed a duty to non-client third parties. *See Am. Int'l Spec. Lines Ins. Co. v. Canal Indem. Co.,* 352 F.3d 254, 260 (5th Cir.2003) ["To determine state law, federal courts … look to the final decisions of the state's highest court. In the absence of a final decision by the state's highest court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case."].

59. The Supreme Court of Texas would apply the same theory to accountants that it applies to attorneys, namely, that only the audit client may recover on a pure negligence theory.

■■■ 60. C & F did not owe a duty to SIPC or the Sunpoint customers to exercise that degree of care, skill and diligence required to be exercised by reasonably prudent certified public accountants and auditors under the same or similar circumstances.

■■■ 61. While standards promulgated by the accounting community, such as Generally Accepted Auditing Standards, are a common benchmark of an auditor's performance, such standards do not constitute legal standards, nor are they a conclusive statement against which an auditor's

conduct will be measured in a court of law. *Greenstein,* 744 S.W.2d at 185 ["An accountant *usually* discharges the duty owed to his client by complying with recognized industry standards, such as the 'Generally Accepted Auditing Standards,' when performing an audit." (emphasis added)].

62. The American Institute of Certified Public Accountants promulgates audit and accounting guides to advise auditors of the proper auditing procedures in various industries. The AICPA published an audit and accounting guide for securities brokers and dealers, effective April 1, 1997 (the "Audit Guide"). AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, AICPA AUDIT AND ACCOUNTING GUIDE, BROKERS AND DEALERS IN SECURITIES (1997).

■■■ 63. The Audit Guide suggests auditors should, as part of the planning process, gain an understanding of the business to be audited. Fundamental to any understanding of Sunpoint's business would be an understanding that Sunpoint, like most brokerdealers, made use of a money market sweep arrangement. Audit Guide, § 5.13(a).

■■■ 64. Reliance is an essential part of the element of causation in an action for professional negligence. *F.D.I.C. v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992) ["In the present case, however, a claim that reliance is not a component of causation strains credulity."]. However, reliance on the competent performance of an audit is sufficient to prove causation, even if nobody actually relied, or justifiably could have relied, on any specific misstatement contained therein.

■■■ 65. Additionally, the NASD and SEC's reliance on the audit work of C & F is sufficient to meet the required showing

of reliance as an element of causation.[264] The fact that C & F's failure to detect a $12 million theft in November of 1998 was a substantial factor that allowed that theft to continue throughout the ensuing year cannot be seriously controverted. Note that the Fifth Circuit, in identifying reliance as an essential part of causation, stated only that, "If *nobody* relied on the audit, then the audit could not have been a 'substantial factor in bringing about the injury.'" *Id.* (emphasis added).

66. C & F breached its duty to Sunpoint to exercise that degree of care, skill and diligence required to be exercised by reasonably prudent certified public accountants and auditors under the same or similar circumstances.

*Negligent Misrepresentation*

■ 67. The theory of negligent misrepresentation in a malpractice context is reserved for plaintiffs who are not parties to a contract for professional services, but who do rely on the work of the professionals, to recover from the contracting professionals. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex.1999).

■ 68. Before a plaintiff may recover for negligent misrepresentation, he must establish that the defendant owed him a duty to avoid any inaccurate representations. *Cook Consultants Inc. v. Larson*, 700 S.W.2d 231 (Tex.App.Dallas 1985, writ ref'd n.r.e.) ["Actionable negligence presupposes the existence of a legal relationship between the parties through which the wrongdoer owed a duty to the injured party."].

69. While such a duty was historically limited to relationships of privity between the parties, *see generally First Nat. Bank of Commerce v. Monco Agency, Inc.*, 911 F.2d 1053, 1057-60 (5th Cir.1990), that standard was eventually relaxed by some jurisdictions to impose liability for the benefit of any party whose use of the misrepresented information was foreseeable. *See generally Compass Bank v. King, Griffin & Adamson P.C.*, 2003 WL 22077721, at *2 (N.D.Tex. Sept.5, 2003) [noting the breadth to which other jurisdictions have extended liability], *aff'd*, 388 F.3d 504 (5th Cir.).

70. However, Texas has rejected *de facto* foreseeability as the basis for negligent misrepresentation and instead has selected a more conservative departure from traditional privity by adopting the RESTATEMENT (SECOND) OF TORTS § 552.[265]

71. Section 552 limits the potential liability of an information supplier to those plaintiffs belonging to a *limited group* for

---

**264.** Note that such systemic reliance is not sufficient to sustain a cause of action for negligent misrepresentation, where reliance is an essential element of the cause of action wholly separate from the element of causation.

**265.** § 552 provides in part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

RESTATEMENT (SECOND) OF TORTS § 552 (1977).

whose benefit and guidance he knows and intends that the information be supplied and relied upon. *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 612 (5th Cir.1996) (noting that Texas has adopted the Restatement (Second) of Torts § 552); *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

■■■ 72. Thus, for a member of that limited group to prevail on a claim for negligent misrepresentation under Texas law, four elements must be established: (1) the defendant made a representation in the course of his business or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the defendant's representation. *First Nat'l Bank of Durant v. Trans Terra Corp. Int'l*, 142 F.3d 802, 808–09 (5th Cir.1998); and *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n. 24 (Tex.2002); both citing *Sloane.*

73. Rule 17a–5(d) requires a broker or dealer to file annual audited financial statements and internal control reports with the SEC, the designated examining authority (in this case the NASD), and all self-regulatory organizations of which the broker is a member. 17 C.F.R. § 240.17a–5(d).

74. Rule 17a–5(c)(2) requires a broker or dealer to provide to customers a copy of the audited annual financial statements of the firm. 17 C.F.R. § 240.17a–5(c)(2).

75. Rule 17a–5(c)(2)(iii) requires that, if the auditor commented on any material inadequacies in the 17a–5 report, then the statement of financial condition sent to customers by the broker or dealer must contain a statement giving notice to customers that a copy of such report on material inadequacies is available for customers inspection at the Washington, D.C. and regional offices of the SEC. 17 C.F.R. § 240.17a–5(c)(2)(iii).

■■■ 76. As C & F was aware of these requirements, the SEC, the NASD, and the Sunpoint customers were all within the limited group entitled to rely on C & F's statements of fact.

77. SIPC is not within the limited group entitled to rely on C & F statements, because C & F was not aware that SIPC would receive such statements.

■■■ 78. Justifiable reliance is also a necessary element of a cause of action for negligent misrepresentation. *See* Restatement (Second) of Torts § 552 ["One who ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them *by their justifiable reliance* upon the information, if he fails to exercise reasonable care ..."] (emphasis added); *Scottish Heritable Trust*, 81 F.3d at 614–15["[T]he Restatement requires that a plaintiff justifiably rely on the information that the defendant negligently misrepresents."]; *McCamish*, 991 S.W.2d at 794 ["Moreover, section 552 guards against exposure to unlimited liability by requiring that a claimant justifiably rely on a lawyer's representation ..."].

79. Plaintiffs cite to a singular (and arguably superseded) [266] decision of a Texas appellate court for the proposition that

---

266. *See Tara Capital Partners I, L.P. v. Deloitte & Touche, L.L.P.*, 2004 WL 1119947 (Tex.App.Dallas, May 20, 2004, pet.denied).

they need not show that they directly relied on C & F's alleged misrepresentations. *See Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231 (Tex.App.Dallas 1985, writ ref'd n.r.e.). In *Cook,* the appellate court refused to overturn a jury finding of liability in favor of a home-buyer who, though she had not seen the survey, sued a surveyor for negligent misrepresentation. *Id.* at 237.

80. The parties have not cited, and the Court has not located, any decision of the Texas Supreme Court case endorsing a finding of liability for a negligent misrepresentation absent some evidence of direct reliance.[267]

■ 81. This Court is not bound by the questionable decision of an intermediate Texas court, but rather is charged with determining whether the Supreme Court of Texas would require actual reliance in this context. *See Am. Int'l Spec. Lines Ins. Co. v. Canal Indem. Co.,* 352 F.3d 254, 260 (5th Cir.2003) ["To determine state law, federal courts ... look to the final decisions of the state's highest court. In the absence of a final decision by the state's highest court on the issue at hand, it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case."].

■ 82. Noting the strict application of the Restatement by the Supreme Court of Texas in *McCamish,* 991 S.W.2d 787,

and other federal courts' reasoning on the subject, *see, e.g., McNamara v. Bre–X Minerals Ltd.,* 197 F.Supp.2d 622, 698–99 (E.D.Tex.2001) ["Because the Complaint fails to allege that any of the named Plaintiffs actually relied on any statements by these Defendants, these causes of action are dismissed."]; *Compass Bank,* 2003 WL 22077721, at *4, this Court believes the Supreme Court of Texas would decide that actual reliance remains an essential element of a cause of action for negligent misrepresentation.

■ 83. Because neither SIPC nor the Sunpoint customers actually relied on the alleged misrepresentations of C & F, they cannot recover under a theory of negligent misrepresentation.[268]

84. Plaintiffs cite to *Resolution Trust Corp. v. Coopers & Lybrand,* 915 F.Supp. 584, 590–91 (S.D.N.Y.1996) for the proposition that negligent misrepresentations to the NASD or the SEC by C & F constituted negligent misrepresentations to SIPC as a matter of law. Actually the *Resolution Trust* decision stands for the proposition that an entity similar to SIPC has standing to sue, but it does not relieve such an entity of the burden to prove the elements of its cause of action in order to recover.

85. SIPC cannot recover without proof that it actually relied on the misstatements of C & F.

---

**267.** The Texas Supreme Court has identified reliance as an element of a negligent misrepresentation cause of action. *McCamish,* 991 S.W.2d at 794.

**268.** Note that California applies this precise analysis on facts similar to those now present: "One Plaintiff ... had not received or read the Arthur Young audit and, therefore, could not have relied on it in making his investment. The jury nonetheless returned a verdict in his favor. The Court of Appeal re-

versed the judgment ... finding the absence of reliance fatal to his claim." *Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 378 n. 2, 11 Cal.Rptr.2d 51, 834 P.2d 745, 748 n. 2 (Cal. 1992).

Because the Sunpoint customers did not rely, Sunpoint cannot recover for negligent misrepresentation in its capacity as bailee of the assets of the Sunpoint customers, nor can SIPC recover as a subrogee of the customers' claims.

86. Neither may SIPC substitute the reliance of the NASD for its own. The existence of a regulatory structure is not a surrogate for actual reliance in the context of a state law action for negligent misrepresentation. As the New York Court of Appeals observed in a similar situation in *Sec. Investor Prot. Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 709–11, 746 N.E.2d 1042, 1047–48, 723 N.Y.S.2d 750 (N.Y. 2001):

> Plaintiff cannot sustain a cause of action for fraud if defendant's misrepresentations did not form the basis of reliance ... SIPC relied to its detriment on the implication of the NASD's silence, not on representations from [the defendant].... [T]he absence of communication from the NASD to SIPC could have meant any number of things, among them that the regulators were not carefully reading defendant's [statements]. The vagaries inherent in SIPC's theory of liability convince us that no information at all is simply too little information on which to base a claim....

87. Because SIPC was never aware of the contents of the audit reports, it cannot demonstrate that it justifiably relied on any statement made by the auditors in those reports, and it cannot recover against C & F upon a theory of negligent misrepresentation.

*Third–Party Complaint and Counterclaims*

88. Defendants have filed an Original Third Party Complaint and Counterclaim, asserting claims against Lewis, Wilder, Dieter, and the Trustee. They have asserted causes of action for fraud, negligent misrepresentation, and comparative negligence against Lewis and Wilder; for only comparative negligence against Dieter; and for fraud, negligent misrepresentation, breach of contract, and comparative negligence against the Trustee.

89. The elements of a cause of action for fraud are as follows: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 284 F.Supp.2d 511, 644 (S.D.Tex.2003); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex.2001).

90. Not only must the complaining party rely on the representation, but his reliance must be reasonable and justified. *Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex.App.Houston [14th Dist.] 2006, pet. denied).

91. As stated above, justifiable reliance is also an element of a claim for negligent misrepresentation. *Enron Corp.*, 284 F.Supp.2d at 646.

92. A reasonable auditor, knowing management has made false representations, should view skeptically other representations made by management, and should seek other reliable audit evidence to preclude any need to rely on management representations. *See* AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, CODIFICATION OF STATEMENTS ON AUDITING STANDARDS, AU § 333.04 (1998).

93. Because C & F could not justifiably rely on the representations of Lewis, Wilder, and Sunpoint, its causes of action for fraud and negligent misrepresentation against those entities must fail.

94. While Sunpoint undoubtedly breached its contract with C & F by failing

562

to adequately design and implement a sufficient system of internal controls, failing to maintain and disclose to C & F accurate and complete financial information, and failing to provide a reliable management representation letter, those breaches did not proximately cause C & F to perform its auditing duties in a negligent manner. Thus, C & F has failed to prove that it has sustained any damages as a proximate cause of Sunpoint's breach of contract.

*Imputation Issues*

■ 95. Generally speaking, a corporation can only obtain knowledge or notice through individuals who serve as its officers, directors or employees. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 391 (Tex.1997).

■ 96. In most cases, knowledge acquired in furtherance of the corporation's business or within the course of the employment of an individual serving in some corporate representative capacity will be imputed to the corporation.[269] *La-Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 563 (Tex.1984); *City of Fort Worth v. Pippen,* 439 S.W.2d 660, 665 (Tex.1969).

■ 97. "The imputation doctrine is derived from common law rules of agency relating to the legal relationship among principals, agents, and third parties. Pursuant to those common law rules, a principal is deemed to know facts that are known to its agent." *NCP Litigation Trust v. KPMG, LLP,* 187 N.J. 353, 901 A.2d 871, 879 (2006).

98. "A principal's agents link the principal to the external world for purposes of taking action, including the acquisition of facts material to their work for the principal. . . . Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them. Additionally, imputation encourages a principal to develop effective procedures for the transmission of material facts, while discouraging practices that isolate the principal or coagents from facts known to an agent." Restatement (Third) of Agency § 5.03 cmt. b (2006).

99. Thus, if applicable to the current case, the knowledge of the theft and any affirmative misrepresentations and/or omissions perpetrated by Lewis, Wilder and Dieter to mask the ongoing thefts would be imputed to Sunpoint, and to its successor-in-interest, the Trustee of its liquidation estate. Given that there is no evidence of any intentional or material participation in the fraud by C & F, such imputation would preclude the Trustee from maintaining this negligence cause of action against the Defendants. *See F.D.I.C. v. Shrader & York,* 991 F.2d 216, 226 (5th Cir.1993) [holding that, under Texas law, a claim of professional negligence against a professional does not always strip a professional from the class of "innocent parties" which the equitable rule of imputation is designed to protect].

■ 100. The application of the imputation doctrine is a matter of state law, *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 83–85, 114 S.Ct. 2048, 2052–54, 129 L.Ed.2d 67 (1994).

---

**269.** "Deciding whether to permit an auditor to utilize imputation requires a detailed factual analysis of the dispute." Maureen Mulligan et al., *Recent Developments in the Law Affecting Professionals, Officers, and Directors,* 36 Tort & Ins. L.J. 519, 535 (2001). Therefore, issues pertaining to the proper use of imputation are best handled after trial, as opposed to a preliminary motion or summary judgment stage. *See, e.g., In re Crazy Eddie Sec. Litig.,* 802 F.Supp. 804, 817–18 (E.D.N.Y.1992); *Sec. Investor Prot. Corp. v. Adler Drobny Fischer LLC (In re R.D. Kushnir & Co.),* 274 B.R. 768, 782 (Bankr.N.D.Ill.2002).

■ 101. Texas law and its adoption of the imputation doctrine in certain circumstances does not bar the Trustee in this instance from maintaining a negligence cause of action against an auditing firm which was negligent within the scope of its engagement by failing to uncover or report the misappropriation of funds by corporate officers and directors.[270]

■ 102. The imputation of knowledge of a corporate representative or agent to a corporation is not absolute. The rule of imputation under Texas law "is for the protection of innocent third parties and does not protect those who collude with the agent to defraud the principal. So, that rule loses its applicability when the agent is acting fraudulently toward his principal. In that situation, the agent's knowledge is not binding on the principal and one who avails himself of the fraudulent services of the agent cannot claim that the agent's acts or knowledge bind the defrauded principal." *Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex.Civ.App.-Amarillo 1979, writ ref'd n.r.e.), citing *Centennial Mut. Life Ass'n v. Parham*, 80 Tex. 518, 16 S.W. 316, 319 (1891) and *Southern Farm Bureau Cas. Ins. Co. v. Allen*, 388 F.2d 126, 131 (5th Cir.1967).

■ 103. If the agent is acting adversely to the corporation, the corporation may not be bound by the agent's activity or knowledge. *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir.1992) ["Generally, courts impute a bank officer or director's knowledge to the bank unless the officer or director acts with an interest adverse to the bank."], *citing F.D.I.C. v. Lott*, 460 F.2d 82, 88 (5th Cir.1972). This is generally described as the "adverse interest" exception to the imputation rule.[271]

---

**270.** This conclusion is generally supported by the new Restatement (Third) of Agency which presents the following factual scenario in regard to imputation:

> 5. A, the chief financial officer of P Corporation, withholds material financial information from T, P Corporation's auditor. T does not independently discover the information and certifies materially inaccurate financial statements for P Corporation. Yet T knows or has reason to know that A has withheld material information from T. P Corporation sues T, claiming that T is subject to liability to P for loss suffered by P Corporation due to its inaccurate financial statements. T may *not* assert, as a defense to P Corporation's claim, that A's knowledge of P Corporation's true financial condition is imputed to P Corporation.
>
> Illustrations 4 and 5 do not specify whether T's failure independently to discover the information withheld by A is the consequence of common-law negligence on T's part; whether T's failure is the consequence of a breach of an independent professional or legal obligation owed by T as an auditor; or whether T has violated other legal requirements applicable to auditors, such as requirements of independence, prohibitions on conflicts of interest, or prohibitions on improper influence of a chief financial officer on the conduct of an audit. These issues are not relevant to P Corporation's liability to S [an innocent third party described in illustration # 4 who reasonably relies on the inaccurate financial statements]. These issues are, however, relevant when the legal relations in question are those between P Corporation and T, as in Illustration 5. *The nature of T's duties to P Corporation may subject T to liability to P Corporation, independently of whether A's knowledge is imputed to P Corporation.*

RESTATEMENT (THIRD) OF AGENCY § 5.04 cmt. c, illus. 4–5 (2006) (emphasis added).

**271.** The RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006) adopts the following statement regarding the adverse interest exception to the imputation rule:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is *not* imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person. Nevertheless, notice *is* imputed:

104. "The adverse interest exception is entirely consistent with the principles of agency law.... Normally courts will impute the knowledge of an agent acting within the scope of his agency to his principal, because courts presume that such an agent communicates that knowledge to his principal. The practice of *presuming* the transfer of knowledge, and thus *imputing* the agent's knowledge to the principal, is a fiction.... That fiction is untenable, however, when an agent has *totally abandoned* the interests of his principal, and acted *entirely* in his own or a third party's interest, because an agent cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." *Ernst & Young v. Bankruptcy Services, Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 369–70 (S.D.N.Y.2004)(emphasis in original and internal quotations omitted).[272]

 105. Texas law recognizes the adverse interest exception to imputation. With regard to imputation for the acts of an agent, "[I]n Texas, whether an employee's fraud is imputed to the corporation depends upon whether the fraud was on behalf of the corporation or against it." *Ernst & Young*, 967 F.2d at 170–71, *citing Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 190–91 (Tex.App.-

Waco 1987, writ denied); *see also, Fla. Dept. of Ins. v. Chase Bank of Texas, N.A.*, 274 F.3d 924, 935 n. 39 (5th Cir.2001).

 106. "The adverse interest exception is a narrow one; for it to apply, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes." *CBI Holding*, 311 B.R. at 369–70; *see also, Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir.1997) [acknowledging an exception to imputation "if the plaintiff can show that the officer/director was acting adversely to the corporation and entirely for his own or another's purpose"].

 107. "The officer/director, though, must act so that his endeavors are so incompatible that they destroy the agency." *Id.*

108. Under the application of the adverse interest exception, the burden to show that Lewis, Wilder and Dieter acted entirely for their own self-interests and against the interests of the corporation rests solely upon the Trustee. *Id.* at 668.

109. The preponderance of the evidence establishes that, during the relevant time period, Lewis was consistently and

(a) when necessary to protect the rights of a third party who dealt with the principal in good faith; or
(b) when the principal has ratified or knowingly retained a benefit from the agent's action.
A third party who deals with a principal through an agent, knowing or having reason to know that the agent acts adversely to the principal, does not deal in good faith for this purpose. (emphasis added).

272. It further explains why the fraudulent actions of the culpable officers cannot be blindly ascribed as an "act of the corporation" outside of the law of agency, as it might be in a gross negligence or exemplary damage case against the corporation, and endorsed by the auditors as an absolute bar to the Trustee's

recovery, even though the officers might otherwise meet the definition of a "vice-principal." *Rhodes, Inc. v. Duncan*, 623 S.W.2d 741, 744 (Tex.App.-Houston [1st Dist.] 1981, no writ) ["[T]he liability of a corporation for the acts of its vice-principal is not absolute but is limited to those acts which are referrable to the company's business to which the vice-principal is expressly, impliedly or apparently authorized to transact."]. *See also, Kiepfer v. Beller*, 944 F.2d 1213, 1219 (5th Cir. 1991); *Horton v. Robinson*, 776 S.W.2d 260, 267 (Tex.App.-El Paso 1989, no writ) ["The fact that a corporation might indirectly or incidentally benefit from such unauthorized acts would not, standing alone, render a corporation liable."].

repeatedly acting in his own economic self-interests.

110. Lewis did not act to further Sunpoint's interests. He did not seek to enrich himself by maximizing the value of the stock which he held in Sunpoint. He used Sunpoint, as he used all of the other Lewis Affiliates, merely as another tool or medium through which he sought to advance his own personal financial objectives.

111. The auditors specifically observed and reported that Lewis viewed Sunpoint as his personal assets to do with as he wished. Indeed, such an attitude was reflected in the infamous corporate resolution (passed by Lewis as Sunpoint's sole director) which authorized Lewis to utilize Sunpoint assets to collateralize his personal debts.

112. The evidence further establishes that Lewis controlled the actions of Wilder and Dieter.

113. Wilder acted in concert with Lewis at his direction and she engaged Dieter to participate in the various acts of misappropriation essentially whenever Lewis made a "cash call" upon her.

114. Knowledge of these improper and illegal activities were concealed from other officers and employees of Sunpoint and there is uncontroverted evidence that others employed by Sunpoint would have reported these misappropriations to the appropriate authorities had such misconduct been detected.

115. While Wilder and Dieter apparently obtained little financial reward for their activities when compared to the sums obtained by Lewis through their actions, they loyally followed Lewis' instructions to invade the customer funds without hesitation whenever he indicated a need for cash.

116. Wilder and Dieter did so for a substantial period of time without exercising the slightest concern for customers of Sunpoint or what such activity would mean for the future economic viability of Sunpoint. They accepted—and unswervingly responded—to the concept that all of Sunpoint's assets actually belonged to Lewis and that he could dispose of them at his whim.

117. The actions of Lewis, Wilder and Dieter reflected a complete abandonment of the interests of Sunpoint, and though occasionally funds were infused into Sunpoint as required to keep the operation in existence and to satisfy periodic regulatory requirements, such infusions were incidental and never intended for the benefit of Sunpoint, but rather were intended to preserve one of the mechanisms by which Lewis could access large amounts of cash for his personal use. Any economic advantage enjoyed or realized by Sunpoint for any reason was subject to immediate appropriation by Lewis for his own personal benefit.

118. The adverse interest exception to imputation is available in these circumstances because there was never merely a single representative of the corporation in these circumstances. *See Mays v. First State Bank of Keller,* 247 S.W. 845, 846–48 (Tex. Comm'n App.1923, judgm't adopted) [agent's knowledge imputed to corporation despite adverse interest where agent acted as sole representative of corporation].

119. As one court described the single actor rule:

> [I]f an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests. The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corpora-

tion must bear the responsibility for allowing an agent to act without accountability.

*McNamara v. PFS (In re Personal and Bus. Ins. Agency),* 334 F.3d 239, 243 (3d Cir.2003).

■ 120. While Lewis certainly enjoyed a predominant position of control, he clearly did not act as the sole representative of Sunpoint and, under Texas law, "sole actor" means just that—sole actor— and is not applied when the rationale for the rule has no application. *Id.; Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 63 (1941); *GXG, Inc. v. Texacal Oil & Gas,* 977 S.W.2d 403, 421 (Tex.App.-Corpus Christi 1998, pet. denied).

121. Even if the adverse exception rule had no applicability, other policy reasons exist to forego the application of the imputation rule as to corporate auditors. A recent case outlines the parameters of these considerations in this context:

> Imputing an agent's actions and knowledge to the principal serves several salutary purposes.... However, the rationale for imputation in a simple principal-agent relationship begins to break down in the context of a corporate audit where the allocation of risk and liability among principals, agents, and third parties becomes more complicated. As noted, this matter involves corporate officers who, as agents of the corporation, committed accounting fraud, and a third-party auditor that allegedly was negligent in failing to discover the resulting inaccuracies in the financial records. If the officers' wrongful conduct is imputed to the corporation, the corporation itself can be said to have committed the fraud. Further the wrongdoing also may be imputed to the corporation's successor-in-interest who then would be estopped from suing the allegedly negligent third-party auditor.

> Such an application of the imputation defense has been criticized, however, because agency doctrines ... operate on an all-or-nothing basis. That is, the negligent auditor either faces total liability or none. Those disparate results seem severe and unmodulated by concern for the specifics of individual cases. Absolving negligent corporate auditors is difficult to rationalize and to justify or explain in any satisfying or comprehensive way. As a result, courts have struggled to determine what circumstances permit an auditor to invoke this defense.

*NCP Litigation Trust,* 901 A.2d at 879–80. (citations and internal quotations omitted).[273]

122. The applicability of the imputation rule in auditor liability cases has been closely scrutinized by the United States Court of Appeals for the Seventh Circuit in two oft-cited opinions construing Illinois law: *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982) and *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983). The synthesis of those decisions is essentially that the imputation rule should be invoked in auditor liability cases only under circumstances in which its application would serve the objectives of tort liability—to compensate the victims of wrongdoing and to deter future wrongdoing. *Cen-*

---

**273.** The Supreme Court of New Jersey concluded that the trustee's suit "is not barred because one who contributed to the misconduct cannot invoke imputation. We therefore conclude that a claim for negligence may be brought on behalf of a corporation against the corporation's allegedly negligent third-party auditors for damages proximately caused by that negligence." *NCP Litigation Trust,* 901 A.2d at 882.

co, 686 F.2d at 455; *Schacht,* 711 F.2d at 1348.

123. The *Cenco/Schacht* synthesis very closely tracks the considerations underlying the adverse interest exception to imputation under Texas law. The Seventh Circuit endorsed imputation for the auditors in *Cenco* against the plaintiff-stockholders because it found that management's fraudulent actions actually benefitted the company and that to allow any recovery would actually reward the perpetrators of the fraud at the expense of innocent third parties. *Cenco,* 686 F.2d at 455–56.

124. However, the Seventh Circuit later denied the use of imputation by the auditors against an independent liquidator in *Schacht* because the fraudulent activity had not benefitted the corporation (finding that the artificial prolonging of the corporation for benefit of the fraudulent actors was a "Pyrrhic benefit") and the corrupt officers would not share in any eventual recovery by the liquidation agent—but rather such would be shared by creditors and policyholders. *Schacht,* 711 F.2d at 1348.

125. The use of the imputation rule in favor of the auditors in the present case does not promote the objectives of the tort system.

126. Its allowance would not promote the compensation of victims. The Trustee represents the interests of creditors, both those whose customer claims have now been fully satisfied by SIPC and the interests of general unsecured claims of Sunpoint. Those creditors did not benefit from the fraudulent activities of Lewis and Wilder. They were victims.

127. Neither would the allowance of an imputation defense deter future wrongdoing. The culpable officers will not share in any recovery realized from the prosecution of the negligence claim against C & F.

That is a mathematical certainty due to the prioritization of sizable claims asserted against the estate. It is also a metaphysical certainty because the culpable officers have either died or absconded from the country.

128. In fact, to allow imputation to protect C & F in this instance would produce an opposite effect. It would exonerate these auditors from all liability for their miserable failure to perform their audits according to the applicable standards of their profession.

129. The imputation rule is designed to protect innocent third parties with whom a dishonest agent deals on a principal's behalf. *Janvey v. Thompson & Knight, LLP,* 2003 WL 21640573 at *6 (N.D.Tex., July 8, 2003), citing *Crisp,* 586 S.W.2d at 615. *See also, Waslow v. Grant Thornton LLP (In re Jack Greenberg, Inc.),* 240 B.R. 486, 507 (Bankr.E.D.Pa. 1999) ["Unlike traditional imputation cases, in auditor liability cases the plaintiff is not seeking to retain the benefit of a fraudulent transaction and the defendant is not an innocent party."].

130. The imputation rule is not designed to protect parties such as C & F whose negligence was neither caused nor induced by any concealment by Lewis and Wilder pertaining to the manner in which the Alliance account was controlled, and whose adherence to the appropriate standard of professional care would have significantly impacted the capability of the corrupt officers to engage in the misappropriation of customer funds.

131. C & F failed to discover independently the misappropriation of funds from the Alliance account by Lewis, Wilder, and Dieter. While the corrupt officers of Sunpoint obviously did not disclose to the auditors that the thefts were taking place, neither was the auditors' failure to adhere

to the proper standard of care with regard to the control of the Alliance account a result of any misrepresentation or act of concealment by Lewis, Wilder, or Dieter.

132. Allowing C & F to escape liability for its negligent conduct does not promote the purpose of the imputation doctrine—the protection of innocent parties—and its preclusion in this case would not violate the imputation principles previously addressed in earlier jurisprudence. *Ernst & Young*, 967 F.2d at 171–72 [permitting imputation only when it was clear that the culpable officer was clearly acting on the corporation's behalf and specifically stating that "[W]e do not hold that [the auditors] can never be held liable for its negligence.... Moreover, we are not holding that an auditor is never liable to a corporation when a corporation's employee or agent acts fraudulently on the corporation's behalf."]; *F.D.I.C. v. Shrader & York*, 991 F.2d 216, 224–25 [allowing imputation only when there was no evidence that the defrauding corporate officer "embezzled from, looted, or otherwise personally profited" from the transactions at issue].

133. Subject to any protection which it might enjoy through the principles of proportionate responsibility, C & F should properly and legitimately bear its portion of the blame for the destruction of Sunpoint and the catastrophic economic loss suffered by its customers.

*Proportionate Responsibility*

■ 134. In virtually any cause of action based upon tort asserted under Texas law, Chapter 33 of the Texas Civil Practice and Remedies Code ("Chapter 33") requires the trier of fact to engage in a comparative fault analysis and to determine the "percentage of responsibility" among various persons who could be held liable for the damages which have been sustained by a plaintiff in a tort action. There have been several versions of Chapter 33 enacted.[274]

135. Except for the issue of the application of settlement credits in the calculation of a claimant's maximum recovery under TEX. CIV. PRAC. & REM.CODE § 33.012,[275] this case is governed by Chapter 33 as amended by the Texas Legislature in 1995.[276]

136. Specifically under the 1995 statutory scheme, TEX. CIV. PRAC. & REM.CODE § 33.003 provides that:

---

**274.** Chapter 33 "applies to any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." § 33.002(a).

**275.** In the context of settlement credits, the election between a dollar-for-dollar credit and a sliding-scale settlement credit, mandated under the 1995 version of § 33.012(b), was eliminated by the 2003 amendments to the statute. § 33.012(b) was again amended two years later in 2005 and, unlike previous amendments to Chapter 33, the Texas legislature made the 2005 amendment to § 33.012(b) applicable "to all actions ... pending on the effective date of this Act and in which the trial ... begins or after that effective date," Act of June 9, 2005, 79th Leg., R.S., ch. 277, § 2, 2005 Tex. Sess. Law Serv. 770 (Vernon). Thus, the 2005 amendment to § 33.012(b), which now mandates the reduction of a claimant's recovery by "the sum of the dollar amounts of all settlements," in lieu of the 2003 standard of "a percentage equal to each settling person's percentage of responsibility," is applicable to this action, even though the 2003 amendment which it replaced would not have been.

**276.** "This act takes effect September 1, 1995, and applies to all causes of action that accrue on or after that date. This Act applies to all causes of action that accrued before the effective date of this Act and on which suit is filed on or after September 1, 1996." § 33.001 (Historical and Statutory Notes).

The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

(1) each claimant;

(2) each defendant;

(3) each settling person; and

(4) each responsible third party who has been joined under Section 33.004.

TEX. CIV. PRAC. & REM.CODE ANN. § 33.003 (Vernon 1997).

■ 137. Despite the fact that the reference in § 33.003 to a determination of responsibility "as to each cause of action asserted" might appear to suggest that a separate apportionment of responsibility should be made as to each theory of recovery asserted, the statute is properly interpreted as to require only a single assessment of proportionate responsibility involving the apportionment of 100 percentage points of responsibility among all proper persons whose actions have been found to have caused the particular harm under one or more submitted theories of recovery.[277]

■ 138. The responsibility to be ascribed to any particular person is not necessarily measured by the number of acts or omissions found. *See* TEXAS PATTERN JURY CHARGES—MALPRACTICE PREMISES & PRODUCTS PJC 61.4 cmt. (State Bar of Texas 2003); *AlliedSignal, Inc. v. Moran,* 2003 WL 22014805 *3 (Tex.App.-Corpus Christi Aug. 27, 2003, no pet.); *H.E. Butt Grocery Co. v. Pais,* 955 S.W.2d 384, 386 (Tex.App.-San Antonio 1997, no pet.).

■ 139. The applicable statute mandates a determination of the percentage of responsibility not only of the plaintiffs and defendants to the lawsuit, but also of any "settling person" and any "responsible third party who has been joined under Section 33.004," TEX. CIV. PRAC. & REM.CODE ANN. § 33.003 (Vernon 1997), if and only if evidence of the culpability of such party has been introduced at trial.[278]

■ 140. In the context of this proceeding, a "settling person" is a person who at the time of submission had paid or promised to pay money or anything of monetary value to the Trustee at any time in consideration of potential liability with respect to the harm for which recovery of damages is sought. § 33.011(5).

■ 141. In the context of this proceeding, a "responsible third party" is any person, properly joined under § 33.004, over which this Court could exercise jurisdiction and who is or may be liable to the Trustee for all or part of the damages

---

**277.** See generally, Gregory J. Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003,* 35 TEX. TECH L.REV. 1125, 1132 (2004) which contains the following observation:

[T]he legislature was apparently using the term 'cause of action' to refer to the entire set of facts giving rise to a single right of recovery, regardless of the specific legal theory of recovery. This usage is confirmed by the section's requirement of a comparison that reckons negligence, product de-

fects, breaches of other legal duties, or any combination of these. Thus, the standard practice in Texas is to submit a series of liability questions, each submitting a legal theory or defense, followed by a single proportionate-responsibility question....

**278.** "Nothing in this section shall require a submission ... of a question regarding conduct by any party absent sufficient evidence to support the submission." § 33.002(f).

claimed against C & F, and who could have been, but was not, sued by the Trustee. § 33.011(6A).

142. C & F properly joined Van R. Lewis, III, Mary Ellen Wilder, and Doug Dieter as responsible third parties to this proceeding under § 33.004.

 143. The percentage of responsibility among the persons found to have proximately caused the injury or harm for which recovery is sought by the Trustee (including those to whom C & F seeks to attach liability through its Third Party Complaint) is as follows:

| | |
|---|---|
| (a) Sunpoint Securities, Inc.: | 5% |
| (b) Estate of Sunpoint Securities, Inc. by and through Robert G. Richardson, Trustee | 0% |
| (c) Cheshier & Fuller, L.L.P.: | 5% |
| (d) Van Lewis, III: | 65% |
| (e) Mary Ellen Wilder: | 16% |
| (f) Doug Dieter: | 8% |
| (g) Judith Ann Guess: | 0% |
| (h) David Hayslip: | 1% |
| (i) John Pope: | 0% |
| (j) Marvin Sapaugh: | 0% |
| (k) Brett Hagen: | 0% |

144. Therefore, the recovery of damages by the Trustee is not barred by § 33.001.[279]

145. TEX. CIV. PRAC. & REM.CODE § 33.012 governs the Trustee's maximum recovery in this case.

146. § 33.012(a) requires a reduction in the maximum amount of damages to be recovered by the Trustee by the percentage of responsibility assessed against him. As the Trustee is a successor-in-interest to Sunpoint, he takes Sunpoint's position with all its benefits and burdens, and his recoverable damages must be reduced by the portion of responsibility attributable to Sunpoint. Therefore, there is a 5% deduction to the damages proximately caused by the Defendants' negligence, which reduces the recoverable amount from $13,224,914.27 to $12,563,668.56 under § 33.012(a).

147. TEX. CIV. PRAC. & REM.CODE § 33.012(b) further mandates that, if a claimant has settled with one or more persons, a reduction in the maximum amount of damages to be recovered by a claimant is required "by the sum of the dollar amounts of all settlements."[280]

148. However, the Defendants failed to introduce sufficient evidence at trial with which to calculate the sum of the dollar amounts of all settlements paid or promised to be paid to the Trustee with respect to this cause of action.[281]

149. Because of the insufficiency of the evidence regarding the amounts of the respective settlements reached by the Trustee with Judith Ann Guess, David Hayslip, Stanley Seat as the personal representative of the Estate of Harold R. Fuller, Deceased,[282] and with the three 1999 di-

---

**279.** § 33.001 provides that "[I]n an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent." TEX. CIV. PRAC. & REM.CODE ANN. § 33.001 (Vernon 1997).

**280.** TEX. CIV. PRAC. & REM.CODE ANN. § 33.012(b) (Vernon Supp.2006)

**281.** Though sufficient evidence of all of the settlement amounts was not introduced at trial, such information is available from the docket in the liquidation case because of the necessity for the Trustee to seek approval of the settlements under Fed. R. Bankr.P. 9019. However, the lack of sufficient information regarding the settlement amounts is a moot point because the aggregate amount of the settlements, even if properly introduced, would not have reduced the maximum recovery allowed to the Trustee under § 33.012 to an amount less than, nor even near, C & F's maximum liability as calculated under § 33.013.

**282.** Because Fuller's only potential liability in this action arose from his status as a general partner of Cheshier & Fuller, his estate, through Stanley Seat, his personal represen-

rectors, John Pope, Marvin Sapaugh and Brett Hagen, no reduction in the amount of damages to be recovered by the Trustee is required under § 33.012(b).

150. Thus, based upon the assessment of the Trustee's damages at $13,224,914.27, the Trustee's maximum amount of recovery in this case pursuant to § 33.012 is $12,563,668.56.

151. § 33.013 governs the maximum liability which can be assessed against each liable defendant in this action. The § 33.013 determination is reached independently of the § 33.012 calculation of the Trustee's maximum recovery. *Roberts v. Williamson*, 111 S.W.3d 113, 123 (Tex. 2003).

152. § 33.013 provides, in relevant part:

(a) Except as provided in subsection (b) ..., a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death or other harm for which the damages are allowed.

(b) Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if the percentage of responsibility attributed to the defendant is greater than 50 percent.

153. Thus, based upon the assessment of the Trustee's damages at $13,224,914.27, the maximum liability of C & F to the Trustee in this case pursuant to § 33.013 is $661,245.71.

*Gross Negligence*

154. The Trustee seeks an award of exemplary damages against C & F and its partners.

155. Exemplary damages may be awarded under Texas law only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery results from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003 (Vernon 1997). *Tennill v. Boardwalk Fine Properties, Inc.*, 2006 WL 2423587, *3 (Tex.App.Dallas Aug.23, 2006, no pet.).

156. Under the Texas law applicable to this lawsuit,[283] the prerequisite for an award of exemplary damages is a finding of malice as defined in TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon 1997).[284]

157. Section 41.001(7) states that:

Malice is defined as

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the

---

tative, will not be apportioned any responsibility, though the decedent's estate is a settling person as that term is defined. If forced to be named in the assessment of proportionate responsibility, Fuller's estate would bear 0% of the responsibility for this loss.

**283.** Section 41.001 of the Texas Civil Practice and Remedies Code was amended in 2003; however, this action is governed by the version in effect from September 1, 1995 to August 31, 2003.

**284.** This definition of malice in Section 41.001(7) mirrors the definition of gross negligence previously adopted by the Supreme Court of Texas in *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994)

probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

■ 158. Evidence of simple negligence is insufficient to prove either the objective or the subjective elements of gross negligence. *Borg–Warner Corp. v. Flores,* 153 S.W.3d 209, 216 (Tex.App.-Corpus Christi 2004, review granted 4–21–06).

159. Neither C & F nor any of its partners is liable to the Trustee for gross negligence.

*Award of Judgment*

160. The Court has previously held that Cheshier, Bourland, Sprawls, Savage, Connor, and Robertson are jointly and severally liable for any judgment awarded against C & F in favor of either Plaintiff arising from the 1998 Audit of Sunpoint.

161. SIPC will take nothing from C & F and its general partners by reason of its complaint.

162. The Trustee is entitled to recover from C & F and its general partners the sum of $661,245.71, excluding any award of pre-judgment or post-judgment interest and any award of attorney's fees.

■ 163. Since the Trustee's recovery is based solely upon negligence, no attorneys' fees are recoverable by the Trustee in this case. Attorney's fees are not awarded under Texas law unless such a recovery is provided by statute or a contract between the parties. *Travelers Indem. Co. v. Mayfield,* 923 S.W.2d 590, 593 (Tex.1996) and, generally, attorney's fees are not recoverable under a negli-

gence or common law fraud claim. *See Parkway Co. v. Woodruff,* 901 S.W.2d 434, 441 n. 9 (Tex.1995).[285]

164. The Trustee is entitled to prejudgment interest on such judgment sum accruing from September 1, 2000, the date the lawsuit was filed, until the date of judgment at the rate of 8.25% per annum. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex.1998); TEX. FIN.CODE ANN. § 304.104 (West 2006)(regarding date of accrual); TEX. FIN.CODE ANN. §§ 304.003 & 304.103 (West 2006)[interest rate].

165. Thus, the Trustee is entitled to pre-judgment interest through April 23, 2007, in the amount of $362,290.26.

166. The Trustee is entitled to post-judgment interest at a rate of 4.97%. 28 U.S.C. § 1961.

167. Thus, the Trustee shall recover from the Defendants, Cheshier & Fuller, L.L.P., a Texas general partnership, and its general partners, King Bourland, Jeff Cheshier, Jack Sprawls, James Connor, Jack Savage, and Brett Robertson, jointly and severally, the sum of $ 661,245.71, plus pre-judgment interest in the amount of $362,290.26, for an aggregate award of $1,023,535.97, together with postjudgment interest upon such aggregate sum at the current federal post-judgment interest rate of 4.97% until paid.

168. All other relief requested in the Plaintiffs' Complaint or the Third Party Complaint filed by Cheshier & Fuller, L.L.P., in the above-referenced adversary proceeding shall be denied.

169. An appropriate judgment shall be entered consistent with these findings and conclusions.

---

**285.** Attorney's fees under Texas law are presently only recoverable in contracts and actions arising from the DTPA, the Insurance Code, the Texas Whistleblower Act, and claims arising under the Texas Commission on Human Rights Act.

170. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.